ELEAZER  J.  STILES,  Plaintiff,  v.  RUBA  H.  STILES, Defendant.

(Supreme Court, Lewis Special Term, December, 1920.)

Burial — right of control among relatives — restraining interference after interment — injunctions — equity.

> While the primary right to control the burial of a deceased husband is with the widow in preference to the next of kin this rule is subject to modification dependent upon the circumstances of each particular case or the waiver of such right by consent or otherwise.   Charge of a dead body is regarded as a trust, which is subject to regulation by a court of equity to the extent of securing it a proper burial and restraining interference after interment.   (Pp. 580, 581.)
>
> At the death of plaintiff's only son he and his wife were living in the house of plaintiff but in apartments by themselves, and the remains of the son were buried in a cemetery lot which had been used by plaintiff's family for a number of years.   The remains of plaintiff's father and mother and a brother had been buried in said lot, the last named for more than forty years.   In an action for a permanent injunction to prevent the removal of said son's remains by his widow to a cemetery lot in which she was a part owner, the court found and decided as follows:
>
> That at the time of the death of said son the defendant, as his widow, had the superior right to the disposal of his remains.
>
> That after the death and before the burial of said son the plaintiff made certain promises to defendant, and that defendant, relying thereon, waived her right at that time to dispose of the remains of her deceased husband.

That equity requires that plaintiff should perform the promises made by him to defendant relative to the interment of her husband, or in case he fails to perform said promises that she be restored to her original right to dispose of the remains of her husband.

ACTION for a permanent injunction to prevent the removal of a body.

Frank Bowman, for plaintiff.

Thomas Burns, for defendant.

Ross, J.  On the 30th day of October, 1918, Dwight E. Stiles, the only son of the plaintiff, died, and his remains were buried in the cemetery in East Martinsburg in the town of Martinsburg, Lewis county, in a lot which had been used by the Stiles family for a great number of years, and upon which, prior to October, 1918, the remains of the plaintiff's father and mother and a brother had been buried. The last named was buried in said lot some forty or more years ago.

The defendant desires to remove the remains of her husband from the Stiles lot in the East Martinsburg cemetery to what is known as the Old Glendale cemetery, in the town of Martinsburg, in which latter cemetery the defendant's father, Elmer A. Tiffany, owns a lot; and prior to the commencement of this action he had deeded a part of the same to his daughter, the defendant.

The defendant was married in January, 1916. One child was born in August, 1917, and another child was born in April, 1919, after the death of its father (both girls). At the time of his death, Dwight E. Stiles and his wife, the defendant, were living in the house belonging to the plaintiff, but in apartments by them-

selves, the said Dwight E. Stiles having a contract for the rental of the farm of his father, the plaintiff. The husband died on October 31, 1918, of influenza after a brief illness, and the defendant had also had the influenza and was in feeble health during the time of the husband's last illness and at the time of his death and burial.

*Cemetery.* The East Martinsburg cemetery is situated about a half mile from the residence of the plaintiff, where he has resided all his life. The old Glendale cemetery is about two miles from the residence of the plaintiff. The evidence of the respective distances of these cemeteries from Lowville, where the defendant at present resides, does not very clearly appear from the record, but it does appear that the Glendale cemetery is farther from Lowville than the East Martinsburg cemetery.

*Lot.* The Stiles lot is twenty feet square, and, while the boundaries do not exactly correspond with the points of the compass, the body of Dwight is buried on what we will term the south side of the lot, and in the center of the lot from east to west, and is the only interment on that side of the lot. On the north side of the lot are interred the remains of the plaintiff's father and mother and a brother, and appropriate inscriptions are inscribed upon the north face of the monument and occupy the entire space thereon.

*Monument.* In the center of said lot, the plaintiff has caused to be erected a monument and, while the size of the monument is a matter of some importance, the evidence which appears upon the record as to its dimensions is merely guesswork on the part of the witnesses. It consists, first, of a base or platform, upon which rests a stone about a foot in thickness, technically known as a die, or tablet, upon which appears the word " Stiles." From this stone rises what

may be termed the main shaft of the monument, which probably is about thirty inches in width, about thirty-two inches in height, and from a foot to eighteen inches in thickness.

*Inscription.* After the death of Dwight E. Stiles, the plaintiff placed on the monument an inscription " Dwight E., only son of E. J. and Mary M. Stiles " and the dates of birth and death. This inscription is at the bottom of the main shaft, and extends about one-third of the height of the same. The plaintiff had the word " Dwight " placed upon the marker at the foot of the grave. In this connection, the defendant testifies: " He [the plaintiff] said, [to the defendant] ' If you don't like that monument marked that way, I will change it in any way you want.' " It also may be stated that plaintiff evidently intended to place defendant's name and that of her children on the side of the monument.

It appeared upon the trial that the defendant intended to remove the remains of her husband and had a grave dug for the purpose of receiving his remains, and notified the plaintiff to that effect.

No emphasis is placed by either party upon the accessibility of either of these cemeteries to the parties interested; there is no question of a religious character involved, that either ground is consecrated in form by ecclesiastical solemnities; nor any point made of any peculiar sanctity by reason of religious associations, as being near or within a place of worship; there is no evidence that the deceased expressed any preference as to the place where his remains should be interred, which might be controlling (*Matter of Donn,* 14 N. Y. Supp. 189; *Cooney* v. *English,* 86 Misc. Rep. 292) ; so that the only question presented is the priority of the widow or of the father, under the circumstances, to select the place of sepulture. It also

appears that the parties to this action were jointly appointed administrators of the estate of the deceased, so that neither has any advantage in this regard over the other.

The law applicable to this case is well settled, and may be stated briefly as follows: *First.* That the primary right to control the burial of a deceased husband is with the wife in preference to the next of kin. 13 Cyc. 269, 270, and cases therein cited; *Johnston* v. *Marinus,* 18 Abb. N. C. 72, and notes, especially the note embodying the opinion in *Secord* v. *Secor,* on p. 78. *Second.* That this rule is subject to modification, dependent upon the peculiar circumstances of each case, or the waiver of such right by consent or otherwise. 13 Cyc. *supra; Snyder* v. *Snyder,* 60 How. Pr. 368. *Third.* That there is a difference between the right to select the original place of interment and the right to disinterment; in other words, as stated in the authority above cited (p. 271): " Where the interment takes place by the consent, express or implied, of those most nearly interested, it is regarded in law as a final sepulture, and the courts as a rule will not allow a disinterment against the will of those who have the right to object. * * *."

This regard for the sanctity of sepulture existed in very ancient times. About 300 years before the Christian era, Eshmunazar, King of the Sidonians, had engraved in Phœnician characters in the black basalt of his sarcophagus this inscription: " I adjure every royal person and every man that he open not this bed of rest — even if people induce you, listen not to them; for every royal person and every man who opens the lid of this coffin or who takes my coffin away or who removes me who am in this coffin — may he have no funeral bed among the shades; may they be buried in no grave; may they leave after them neither sons nor

posterity. May the Holy Gods deliver them to violent rulers who shall have power over them to destroy them — may they have no root below nor form in life under the sun.'' This warning, attended with a curse, which was undoubtedly directed to the Egyptians or Assyrians who were threatening Sidon, apparently had some effect, or the inscription would not be in existence. This reverence for the undisturbed repose of the dead still remains and is protected by our laws and courts.

*Buchanan* v. *Buchanan,* 28 Misc. Rep. 261: The courts regard with favor the '' repose of the dead.'' In *Matter of Donn,* 14 N. Y. Supp. 189, 192, the following language is used: '' That a proper respect for the dead, a regard for the tender sensibilities of the living. and the due preservation of the public health, require that a corpse should not be disinterred or transported from place to place, except under extreme circumstances of exigency.''

In *Matter of Ackermann,* 124 App. Div. 684, 685, the court uses the following language: '' The right of Christian sepulture includes the right to have one's remains respected in his or her last resting place. Many circumstances arise from time to time necessitating a disturbance of the repose of the dead, but it must be some controlling public reason or superior private right which should induce the court to permit that to be done which from time immemorial has been considered abstractly as a work of desecration.'' *Matter of Adams,* 172 N. Y. Supp. 612.

*Fourth.* That the '' charge of a dead body is regarded as a trust which is subject to regulation by a court of equity to the extent of securing it a proper burial and restraining interference after interment.'' 13 Cyc. 269, and cases therein cited; *Mitchell* v. *Thorne,* 57 Hun, 405. *Buchanan* v. *Buchanan,* 28 Misc.

Rep. 261, a Special Term decision, in which the late Justice Bischoff used the following language: "In every reported case where the remains of a deceased person have been the subject of successful dispute, for matters arising after burial, the questions have been addressed to the equitable jurisdiction of the court, and unquestionably a court of equity is the proper forum.

"When decent burial has been had the further disposal of the corpse must depend upon questions which have nothing to do with assumed personal rights of the surviving relatives."

*Acquiescence of defendant in having husband's remains interred in plaintiff's lot.*

The day after the death of plaintiff's son and defendant's husband, the parties hereto had a talk as to where Dwight should be buried. The defendant expressed a desire to have her husband's body buried in her father's lot in Old Glendale cemetery, to which the plaintiff strenuously objected. The defendant at this time was in a somewhat enfeebled physical condition, not having recovered from a severe illness and the shock from the death of her husband. Whether she was in a condition to be held responsible for her apparent acquiescence in the desire of the plaintiff as to the place of burial, or whether, in the language of the late Justice Forbes, in *Matter of Richardson,* 29 Misc. Rep. 368, 370, "under the circumstances of this case, I do not believe that at the time the petitioner had any settled conclusions about the burial of her husband, and while she may have suffered it to take place at his present grave, I think equity requires that she should not be charged with waiving her rights of burial, nor with consenting, at that time, to a permanent resting place for her husband."

But later, on the same day or on the day following

(the evidence is not clear on which day), she accompanied her father-in-law and her mother-in-law to the rooms of the undertaker in Lowville, some seven miles distant, and selected a casket. I quote in part from the evidence of the defendant on her direct examination: " Q. You went down to Mr. Deakin's (the undertaker's)? A. Yes, sir. Q. Tell what occurred there. A. Well, we went in and were looking over caskets, and I saw one right away that I would like. * * * Q. They talked together? A. Yes; they came over and we were all there together and Mr. Deakin asked if they had picked out one and finally they said yes, I had picked out that one. Q. Who said that? A. I think father told him we would take that one. Q. The one you had selected? A. Father Stiles said to him: ' We will take that one.' I said I liked it best and he said they would take it. Mr. Deakin said: 'Well, Mr. Stiles, where do you expect to bury the body? ' Father spoke up and said: ' In the East Martinsburg Cemetery in our lot.' I didn't answer; I didn't say anything about it at that time. Q. Did you get the casket you selected? A. Yes, sir."

Bearing in mind that at least one day had elapsed since the death of her husband; that the defendant knew a grave had been selected by the plaintiff, and she had been told of its exact location on the lot; that she was able to ride to Lowville and return and to select a casket; that she attended the funeral on either the first or second day after the selection of the casket and was present at the burial and had had an opportunity since her husband's death to consult with her own relatives, her father, mother and brother, the last named having accompanied her and assisted her to the grave; and in view of the fact that she made no complaint until the following May after she had seen, and was dissatisfied with the marking upon the monu-

ment and upon the marker, it would seem that the conclusion is necessary that she did acquiesce in the interment of her husband's body where it now lies.

But this is not all upon this subject. The defendant, in her answer, prepared by able counsel and verified by her on June 24, 1919, at which time she stated her position as follows: " The defendant also admits the burial of remains of decedent in the plot owned by plaintiff, and that the defendant was present at such interment and consented to, but alleges that such consent was made at the time on the understanding and belief on the part of the defendant for the burial of the said deceased, this defendant, and her children, and that there was a sufficient and proper place on said monument for inscription of deaths and burials of this defendant's family, but that there is not such sufficient room nor sufficient place nor space for such inscriptions. * * * "

Because of the foregoing facts, it would seem that the defendant has waived the right she otherwise had to select the place of interment of the remains of her deceased husband.

The case of *Snyder* v. *Snyder,* 60 How. Pr. 368, is instructive upon the question that circumstances may modify the otherwise primary right of the widow to control the interment of her husband's remains. The facts were that David Snyder died in an asylum for the insane at Utica, N. Y., of which he was then an inmate. The defendant, William E. Snyder, was his only son and heir, being the child of his first marriage. The plaintiff, the deceased's second wife, lived with her husband for about two years after her marriage, when he was adjudged a lunatic and he was removed to an asylum. There was no issue of the second marriage. " His son [the defendant, William E. Snyder] was present at the time of his death, took charge of the

remains; the funeral services, by consent of both the widow and son, were held at the home of the widow, she being confined there by illness.'' The widow desired the remains to be buried in a lot owned by her father in the cemetery in the village of Amsterdam. The son desired them conveyed to Glastonbury, Conn., and buried in the lot of the deceased by the side of his first wife and deceased children, and as the son was about to place the remains upon a railroad car for the purpose of transportation to Glastonbury, they were stayed by an injunction which is now sought to be dissolved. The deceased left no will. The learned Judge Landon makes a statement (p. 371) which, it seems to me, is applicable to the case at bar: '' To lay down the inflexible rule that the widow is to be preferred to the children, might, rare as such contentions are, sometimes result in great harshness and outrage. Adopting this rule, I award the disposition of these remains to the son, to the end that they may be buried in the lot purchased by the deceased in his lifetime, near the place of his early residence, where his first wife, and two children by her, lie buried. He had no children by his last wife; the lot in which she proposes to bury him is her father's. It cannot now be known whether she will find her grave in the same lot and not by the side of another husband. It seems to be more in consonance with what we may presume his feelings in his rational moments to have been, to bury him by the side of his children and their mother, rather than alone in the lot of a stranger, and certainly more in consonance with the feelings of those who are bound closest to him by the ties of blood and longest affection. ＊ ＊ ＊.''

It, therefore, only remains for the plaintiff to make good what he has promised to the defendant relative to the interment of herself and children, and for a

suitable space for an inscription upon her own death and that of her children. The position of the plaintiff in this regard appears not only in the complaint and in the evidence upon the trial, and also what the plaintiff stated in answer to interrogatories by the court, but his position in this regard is concisely stated in the brief of his learned counsel in the following language: '' In plaintiff's complaint he agrees to bind himself to provide room for the burial of defendant and her children if in the future she found it desirable that she should be buried there on plaintiff's lot, and in answer to the cross interrogatories at the close of the evidence, the plaintiff testified that he was willing to bond himself to do anything that the defendant might desire in relation to markings on monument and marker and stands ready to bind himself in any way that may be suggested to carry into effect the desires of the defendant in relation to the burial plot or monument or markers thereon as relates to the decedent or herself and children.''

I find the following:

1. That, at the time of the death of Dwight E. Stiles, the defendant, as his widow, had the superior right to the disposal of the remains of the deceased.

2. That, after the death and before the burial of said Dwight E. Stiles, the plaintiff made certain promises to the defendant hereinafter more specifically referred to, and that the defendant, relying upon said promises, waived her right at that time to dispose of the remains of her deceased husband.

3. That equity requires that the plaintiff should perform the promises which he made to the defendant relative to the interment of her husband or, in the event that he fails to perform said promises, that she should be restored to her original right to dispose of the remains of her husband.

4. That the plaintiff agreed to provide room for the burial of defendant and her children on the lot, and to leave space upon the monument for the defendant to place thereon suitable inscriptions for herself, her husband, and her children.

5. That there is sufficient room upon either side of the grave of the deceased husband and son for the interment of the defendant and her two children, and the defendant should have the right to select which side of the lot she desires.

6. That, to authorize plaintiff's taking advantage of the waiver of defendant's right to the disposal of the remains of her deceased husband, he should perform the promises he made at the time of the waiver, in that he execute an agreement, duly acknowledged, providing (a) that defendant and her children may be buried on the lot in which the interment was made, such burial to be made upon the side of the lot she selects pursuant to paragraph 5; (b) that he will remove from the south face of the monument the inscription which he has placed thereon, and the defendant, at her own expense, should have the right to place thereon such inscription as she desires (subject to the approval of the court), even should the above necessitate the plaintiff's erecting at the graves of himself and wife an additional monument; (c) that defendant have the right at all times to visit the grave of her husband and to plant flowers thereon and to care for the same.

7. That the name " Dwight " upon the marker of the grave is to remain undisturbed, as this is, in the opinion of the court, a suitable inscription.

8. That the delivering of the above stipulation should be made on or before December 18, 1920, and, in the event plaintiff does not execute the aforesaid stipulation on or before the 18th day of December,

1920, the complaint is dismissed with costs, and the temporary injunction vacated.

9. That, in the event plaintiff does execute the aforesaid stipulation on or before the 18th day of December, 1920, the plaintiff should cause an appropriate judgment to be entered herein making the terms of said temporary injunction permanent. As the plaintiff does not ask for costs, the same are withheld.

Either party may apply upon the foot of the judgment entered hereon for further relief.

Judgment accordingly.