Joseph P. Sullivan, J.
On August 31, 1967, Joseph Patrick Finn, a man of temperance and regular habits, failed to return home from work at 6:30 p.m., as was his custom. Thus began for Catherine Finn, his wife, the plaintiff herein, a travail which was to continue unabated for eight days until Mr. Finn’s body *948 was discovered at the Jacobi Hospital morgue by the Missing Persons Bureau of the New York City Police Department.
The facts are not in dispute. On his way home from work on that fateful evening, August 31, 1967, Mr. Finn collapsed on a subway station. Taken by ambulance to Fordham Hospital with a Transit Authority patrolman present, he was pronounced dead on arrival at approximately 7:15 p.m. in the emergency room. Almost immediately, a nurse on the hospital staff conducted a search of the body which produced, amongst other personal effects, wallet identification showing the deceased to be one Joseph Finn of 2349 Davidson Avenue in The Bronx. The body, thus tentatively identified, that is, bearing identification but as yet not identified by a member of the family, was sent to the New York City morgue at Jacobi Hospital.
The reason Mrs. Finn was not routinely notified of her husband’s death that evening was due simply to the fact that the death went unreported to the New York City Police Department which, under the system in effect in New York City in situations such as these, is the agency by which notification of death is given to the family or next of kin. The latter lapse was one of those quirks of fate that serves to illustrate the vulnerability of any system which has the human element as an essential component.
The nurse who searched the body at Fordham Hospital was under standing instructions, if no police officer were present, to report the death and all the pertinent details to the clerk at the information desk in the hospital. According to hospital regulations, the information clerk would then immediately communicate the information to the Police Department for notification of the death to the next of kin. In the event, however, that a police officer was present, the nurse in attendance was not to report the incident to the information clerk.
In this case, the nurse who searched the body assumed from all appearances that the Transit Authority patrolman who accompanied Mr. Finn in the ambulance was a New York City policeman. Hence, she did not report the matter at the information desk. In the circumstances, her misapprehension was somewhat justified. The patrolman was attired in a uniform identical almost to the type worn by police department patrolmen. He was observed dutifully to record in his memorandum book every detail of what transpired at the hospital, much as a New York City police officer would in similar circumstances.
The Transit Authority patrolman did report the incident, including the identity and address of the deceased, to his assignment desk officer and the sergeant at the records desk. Transit *949 Authority regulations require that such incidents be reported to the New York City Police Department at the precinct of occurrence. Although the patrolman carried out all of his responsibilities to the fullest measure, neither of his superiors ever reported the death to the police department.
And so, while the body of Mr. Finn lay in unclaimed repose at the morgue, and two detectives assigned to the case by the missing persons bureau to whom the matter had been reported searched in vain for him, investigating leads in such places as Avon, New Jersey and Pinebush, New York, Mrs. Finn, anguishing over her husband’s absence, sat up nights watching for his return and worrying about his health and safety.
From the outset of their investigation, the detectives had discounted death as a real possibility and Mrs. Finn had been assured that no unidentified male nor anyone by the name of Joseph Finn had been brought to a city hospital.
Mrs. Finn had been told that her husband might be suffering from amnesia and, so, each day, searching for him, she would walk through the streets with her sister and daughter; she even looked for him in neighborhood parks and on the subway stations en route from his place of employment. She inquired at various Catholic institutions. Her situation had become desperate. She was under the care of a doctor.
Finally, on September 8, 1967, the eighth day of Mr. Finn’s absence, one of the detectives called Mrs. Finn on the telephone to advise her that he was on his way to her apartment with some news of her husband and to suggest that she have a neighbor present. When the detective arrived, he told Mrs. Finn that a man tentatively identified as Joseph Finn had been pronounced dead at the Fordham Hospital emergency room on August 31, 1967 and that the body had been sent to the morgue at Jacobi Hospital in the Bronx. Mrs. Finn and a member of the family then accompanied the detective to the morgue where the body was identified and claimed.
In defense of the police department’s investigation of Mr. Finn’s whereabouts — not that liability could be fastened upon a municipality on a theory of misfeasance in that regard (see McNeil v. Town of Hempstead, 60 Misc 2d 797; Riss v. City of New York, 22 N Y 2d 579, 583) —it fell victim to its reliance on the infallibility of the system by which the police department would be notified in the event Mr. Finn met with death. In short, the mistake which permitted Mr. Finn’s death to go unreported to the police department in the first instance perpetuated itself and caused the police department, in searching for him, to rule out the prospect of death as a subject for investigation. As a *950 result, a search which should have been speedily concluded was unduly prolonged.
On the basis of Mr. Finn’s medical history, the two detectives assigned to the investigation concluded that he must be dead or hospitalized. Since the police department had not been notified by any hospital of his death or the death of any unidentified male, the possibility of death was eliminated. Furthermore, it was the detectives’ belief that a body could not be removed to a city morgue without the matter becoming a police incident, in which event a police department-aided card would have been made out. A daily check of the aided cards turned in at each of the police department precincts in the city failed to disclose any information in that regard.
In the likelihood, therefore, that Mr. Finn was alive but in all probability, sick or infirm, the two detectives concentrated their efforts on checking at the local hospitals. Their investigation in that area, however, was limited to a check at the information desks since only there would the admission of a patient be recorded.
It was not until the eighth day of their search, after the detectives had exhausted all other areas of inquiry, that the investigation was broadened to include a check of the emergency room records at the local hospitals. An inquiry at the emergency desk at Fordham Hospital on September 8, 1967 brought the search, as well as Mrs. Finn’s ordeal, to an end.
Mrs. Finn commenced a lawsuit against the City of New York as a result of this incident and the action was tried before this court and to a jury on essentially the foregoing facts. Mrs. Finn alleges that defendant was negligent in failing to notify her, as the surviving spouse of Mr. Finn, of his death and in retaining his body without legal authority. She seeks damages for mental anguish, suffering and distress caused by the withholding of his body and the fact of his death.
In her complaint, Mrs. Finn also asserted a cause of action in behalf of the estate of Mr. Finn, as administratrix thereof. Her two children also asserted causes of action as Mr. Finn’s next of kin. For reasons that will be set forth in this opinion, these other causes of action had no legal validity and were discontinued before any testimony was taken.
The issues were submitted to the jury which found in plaintiff’s favor in the sum of $5,000. The court reserved decision on the motions made by defendant during the course of trial challenging the legal sufficiency of the evidence. After the verdict, defendant renewed its motion to dismiss for failure to *951 make out a prima facie case and moved to set the verdict aside as being excessive (CPLE 4404). These are the issues now before the court.
The common law does not regard a dead body as property in the ordinary or commercial sense (Finley v. Atlantic Transp. Co., 220 N. Y. 249, 255; Lubin v. Sydenham Hosp., 181 Misc. 870, 871; Matter of Scheck, 172 Misc. 236, 239), nor does it recognize the body as an asset which belongs to the estate of the deceased (Gould v. State of New York, 181 Misc. 882; O’Donnell v. Slack, 123 Cal. 285; Meagher v. Driscoll, 99 Mass. 281, 284; Larson v. Chase, 47 Minn. 307).
It has been held, however, that while there is no property right in a dead body (Cohen v. Congregation Shearith Israel, 85 App. Div. 65, 67), there is a quasi-property right to the extent that the next of Mn have the right to bury their dead (Diebler v. American Radiator & Std. Sanitary Corp., 196 Misc. 618; Orr v. Dayton & Muncie Traction Co., 178 Ind. 40; see, also, Lubin v. Sydenham Hosp., 181 Misc. 870, 871, supra). Since the wife is nearer in point of relationship and affection to her husband, she, in preference to the next of kin, has the primary right to have, protect and dispose of the remains of a deceased spouse (Stiles v. Stiles, 113 Misc. 576, 580).
Inasmuch as the right to take custody of a dead body is legally recognized (Diebler v. American Radiator & Std. Sanitary Corp., 196 Misc. 618, supra), an interference with the right to dispose of the remains of a deceased is an actionable tort (Lubin v. Sydenham Hosp., 181 Misc. 870, supra). The surviving spouse or next of kin has a right to immediate possession of a deceased’s body for preservation and burial and damages will be awarded against he who unlawfully interferes with that right (Lott v. State of New York, 32 Misc 2d 296, 297). In redress of such a tort mental anguish and mental suffering are proper elements of damage (Finley v. Atlantic Transp. Co., 220 N. Y. 249, supra).
In Lubin v. Sydenham Hosp. (181 Misc. 870, supra), damages were recovered for the refusal of one wrongfully withholding possession of a body to deliver it to the proper party.
Clearly, there, the law gives a remedy to a spouse or next of kin whose sensibilities have been affronted by the wrongful withholding of a deceased’s body. But what of a situation where, as here, the anguish and torment were caused, not by withholding the body, but by withholding the fact of death. It is a fact that throughout the eight days of her husband’s disappearance, plaintiff nurtured the hope and belief that he was still alive; she had no knowledge that he was dead and that his corpse was at the morgue in the custody of the city. Thus, her *952 anguish was the result not of being deprived of the possession of his remains for proper burial, an injury which for its existence must be based on knowledge of the fact that death has occurred, but of not knowing of such occurrence.
If the principle that one may not tortiously withhold a deceased’s body is to have efficacy, then the law must recognize as a corollary thereof, and this court so holds, that one may not tortiously withhold notification of death. To hold otherwise would be to countenance the tort of unlawfully withholding the body of a deceased, which is otherwise proscribed, merely because, through inadvertence or by design, the news of the death has been kept from the next of kin. Such an ambivalance in result is all the more illogical when one considers that the mental anguish likely to ensue from withholding notification of death from the next of kin may well be, as it was in this case for Mrs. Finn, of much greater severity.
Accordingly, the court finds that plaintiff, in establishing that defendant wrongfully withheld her husband’s body and the report of his death from her, has made out a prima facie case. Liability follows whether the withholding is willful, or, as here, is due to negligence (see Lott v. State of New York, 32 Misc 2d 296, supra) Finley v. Atlantic Transp. Co., 220 N. Y. 249, supra).
In its charge, the court put the issue of liability to the jury in terms of whether defendant, having come into custody of the body through its Department of Hospitals, acted with reasonable care to notify the next of kin of the death and to arrange to have the body turned over to the family for the purpose of burial or other disposal. The jury’s resolution of that issue cannot be said to be against the weight of the credible evidence.
As to the amount of the verdict, it should be noted that the measure of damages in a case such as this is the extent to which the feelings and emotions of the surviving kin have been affected by the withholding of the deceased’s body (Lott v. State of New York, 32 Misc 2d 296, 298, supra). There is no other standard by which to measure in monetary terms such intangibles as mental anguish and suffering. It has been held that for injuries to the feelings, there can be no measure of compensation, save the arbitrary judgment of a jury (Leeds v. Metropolitan Gas-Light Co., 90 N. Y. 26, 29, 30).
It would seem, therefore, that if ever there were a case where the standard of value, representing the jury’s judgment as to the monetary worth of the injury, ought to be left intact, this is it. After all, how does one measure the anguish of eight sleepless nights and the torment of endless days of searching and *953 waiting. While the jury’s award of $5,000 might not represent the court’s assessment of damages, such award does not outrage its conscience (Quillen v. Board of Educ., 203 Misc. 320, 322) so as to warrant judicial intervention.
Accordingly, defendant’s posttrial motion is denied in its entirety and judgment may be entered on the verdict.