Frank iS. Bossetti, J.
Pursuant to an order of this court dated December 10, 1971, which order was affirmed by the Appellate Division, Third Department, claimants were granted *291 leave to file a late claim against the State of New York and same was duly filed on or about December 20, 1971.
On August 25, 1970, at about 9 :15 a.m., Adelino Bocha was involved in an accident while working on a 'bridge owned by the State of New York. As a result, he sustained severe and permanent injuries giving rise to this claim wherein damages in the total amount of $1,500,000 are sought. His wife, Maria Bocha, has joined in this action and seeks to recover damages for loss of services and consortium.
Adelino Bocha was employed as a laborer by the Mount Vernon Construction Company which was under contract with the State of New York to perform certain construction work on a bridge located in the Town of North Salem, Westchester County. The construction plans called for the widening of this existing bridge from two to three lanes in both directions and one phase of this operation involved removal of the curbing by means of pavement breakers (also called jackhammers). Prior thereto, steel I-beams were attached to the bridge abutments and a work platform was then erected between these beams. It extended about seven feet from the side of the bridge and some three feet below. This platform was constructed of softwood lumber consisting of seven-foot long planks (bearers) which rested upon the bottom flanges of the steel beams. Three-quarter-inch thick plywood was then placed on top of the planking to form the working platform.[1] As the concrete curbing was removed by jackhammers, the broken pieces fell onto the platform. Simultaneously therewith, a work detail consisting of several laborers would follow along and, while standing on the platform, they shoveled the fallen concrete back upon the bridge deck for removal.
Mr. Bocha first reported to the job site on August 24, 1970 and on that day he was involved in breaking the concrete curb with a jackhammer while standing on the bridge deck. On the following day, in the early morning thereof, Mr. Bocha was instructed by his foreman to stand on the platform in order to shovel the fallen concrete back on the bridge. As he was engaged in this operation, one of the planks broke, causing the plywood covering to give way. This precipitated his fall to the roadway which was some 16 feet below.
During trial, testimony was received from one, Wallace Decker, employed by the New York State Bridge Authority as *292 an engineer. He- .was assigned to this construction project in order to observe the work and ‘1 to see that the contractor * * * complies with the plans and specifications as they were written ”. On August 24 and 25, he recalled seeing men walking up and down the platform and working thereon. Although he did not observe the accident, he arrived at the scene immediately thereafter and saw a “hole” in the platform which “went right down to the roadway underneath ” where “two men were lying”. Mr. Decker prepared an “Inspector’s Daily Report” which was received in evidence as claimants’ Exhibit 15. He noted therein that “ at approximately 9:15 a.m. this morning two laborers fell through the plank and plywood scaffolding on the mall side of [northbound] Bridge #4.” (Emphasis added.)
Prior to Mr. Decker’s testimony, the court received in evidence a “iStandard Accident Report” prepared by Bert E. Tompkins, employed by the New York State Department of Labor as an inspector. Mr. Tompkins was not called to testify; however, he was deposed at an examination before trial and portions of his testimony were read into the record. In substance, Mr. Tompkins stated that he was at the job site on August 25, 1970 in order to investigate an accident; that after his investigation he prepared an accident report in the regular course of his employment and deposited same with his supervisor in the Department of Labor. Parenthetically, it should be mentioned that Mr. Decker testified to seeing Mr. Tompkins at the accident scene “inspecting the lumber and timbers”. Mr. Tompkins ’ report reveals that the ‘ ‘ bearers showed visible physical damage, large knots and severe splits ’ ’ and were not uniformly spaced. He further reported that the plywood pieces did not overhang their end supports by at least 6 inches nor were they .securely fastened in place. As a result of his inspection, he issued corrective orders against the contractor for violations of subdivision (c) and paragraph (1) of subdivision (e) of section 23.12 of the Industrial Code. In effect, the contractor was ordered to:
“(1) Provide a substantial scaffold and/or work platform that will safely support at least 4 times the maximum weight that may be placed thereon for employees working on the bridge. 'Sufficient bracing shall be installed to prevent lateral movement. (Emphasis added.)
“(2) (Securely fasten in place all planking that does not overhang their end supports by at least 6 inches.” (See Exhibit 13 in evidence.)
*293 Former section 23.12 of the Industrial Code, above referred to, read as follows:
“ § 23.12 General provisions for all scaffolds * * * '
“(c) Scaffold structure. All scaffolding shall be so constructed as to bear four times the maximum weight required tó be dependent therefrom or placed thereon when in use (Labor Law, § 240, subd. 3). Such scaffolding shall be provided with all horizontal and diagonal bracing that may be necessary to prevent lateral movement * * "
“ (e) Planking. (1) Except on needle beam scaffolds, planks shall overhang their end supports not less than six inches nor more than 18 inches or they shall be fastened in place. Planks shall be laid tight and inclined planking shall be fastened in place.” (12 NYCRR 23.12 [see, now, 12 NYCRR Subpart 23-5].)
We further note, at this point, that Mr. Tompkins’ report indicates the cause of claimant’s injury to be “ working on an unsafe scaffold”. (Emphasis added.)
Claimants seek to impose liability against the State of New York by asserting a violation of section 240 of the Labor Law, as amended, which violation, it is urged, constitutes liability as a matter of law unrelated to negligence concepts. They also contend that the 'scaffold which collapsed was so negligently constructed as to create a violation of the Rules of the Board of Standards and Appeals as codified in Part 23 of the Industrial Code. (12 NYCRR Part 23.)[2]
In defense of this claim, the State raises two major points: (1) section 240 of the Labor Law is not applicable because the State, as owner, had no control, direction or supervision over claimant’s employer as to the method employed in the operation of the job; and (2) the sole purpose of the platform through which Mr. Rocha fell was to catch the cement as it was chipped from the sides of the bridge and, as such, it cannot be deemed ‘ ‘ scaffolding ’ ’ within the meaning of the Labor Law.
In dealing with the latter argument, generally speaking, a scaffold is a temporary structure of metal, timber, or boards designed for various purposes mainly for 'Supporting a workman in his work and material used by him (Wright v. Smith, 152 App. Div. 476; Caddy v. Interborough R. T. Co., 195 N. Y. *294 415). Although there has been some apparent confusion in what devices might be held to constitute scaffolds, it was «suggested by the Court of Appeals that this depends upon the facts and that each case must be decided upon its own peculiar set of circumstances (Caddy v. Iwterborough R. T. Co., supra).
In the case at hand, there is no question that the contractor chose to erect a platform for two specific purposes, which, in our opinion served to complement each other, i.e., to prevent the chipped concrete from falling to the roadway below; and to provide a safe place for the workmen to stand. These purposes can best be elucidated by citing portions of that testimony received from Wallace Decker, the State engineer. He stated: “ Well, I’ve been inspecting the construction of bridges for 15 or 16 years. In the construction of a bridge, you get involved with some form of scaffolding at every bridge site you ever go on. It stands to reason when they build a column 15 or 20 feet up in the air, you have to have scaffolding to go up the sides of it. And when you form the sides of a bridge deck, you have to create some kind of a scaffolding for men to walk on and for carpenters to work * *■ * y,ou have to have some sort of a scaffolding arrangement for men to stand on. They can’t stand on thin air when they are getting started. We are involved in a war of words here, that’s for sure.”
This witness further testified that he was at the job site every day and observed the work as it progressed. In an attempt to obtain a factual picture of the specific purposes served by the subject platform, the court inquired of Mr. Decker as follows:
“ court: Now, I don’t believe that the record establishes when Exhibit 3, which was the photograph of the job site, was actually taken. However, if you will observe the picture, you will see a man standing on the so-called platform and/or scaffold; and based on your looking at the picture, would you please tell me what he is doing?
“ witness : Well, in this particular photograph he seems to be picking out some of the concrete that the jackhammers have loosened and probably where it’s caught on what I call stirrups, which is the reinforcing bar.
“ court : In other words, that man, that particular gentleman, was not shoveling concrete?
“ witness : Not at this particular moment.
“ court: Did you observe any other men on that particular platform or scaffold performing this type of work other than just shoveling the concrete?
*295 “ witness : Yes. Well, more than likely the same fellow that is picking that concrete off (the side of the bridge) when it falls down by his feet, he picks up his shovel and shovels it back up on the deck.” (Matter in parenthesis and emphasis added.)
“ court : In your opinion as an expert, would you not say this particular structure served a two-fold purpose; one for catching debris and one for having men working on it or standing on it for the purpose of cleaning it up and perhaps chipping away at the loose concrete that was not taken away [by] the jackhammer? Would you not say it served that sort of two-fold or three-fold purpose?
“ witness : I’d have to say yes to that, yes.”
In its posttrial memorandum, defendant argues that the sole purpose of this plywood covering was to prevent concrete from falling on the roadway below. This argument is then extended to its ultimate conclusion that the platform was a “ catch basin” and was never intended to be used as a scaffold. State’s counsel also submits that there were other means of removing the cement therefrom and the fact that the contractor chose to use this platform as a place upon which its employees could stand does not bring it within the purview of the Labor Law. The court disagrees.
Even if we were to assume, arguendo, that the contractor had initially designed this platform for catching fallen concrete, there can be no doubt that once its employees were directed to stand thereon in furtherance of the over-all work operation, the platform, at that point, was intended to be used as a scaffold. We find no merit in the State’s contention that there were other means by which the contractor could have removed the debris. This is purely speculative and certainly belies the instant facts. The contractor elected to have its employees stand on this platform for the purposes of removing the debris and to chip away at the loose cement on the side of the bridge. Having made this election, there is no rational basis for concluding that this structural device was being used by claimant for anything other than a scaffold. Accordingly, it is our determination, under the circumstances of this case, that the platform through, which Adelino Bocha fell constituted a scaffold within the meaning of the Labor Law.
Having arrived at this determination, we must now deal with the State’s contention that section 240 is inapplicable to the instant situation. Subdivision 1 of section 240 of the Labor Law was amended by Chapter 1108 of the Laws of 1969 and *296 now provides, as it did at the time of the subject accident, the following:
“ § 240. Scaffolding and other devices for use of employees. 1. All contractors and owners and their agents, in the erection, demolition, repairing, altering, painting, cleaning or pointing of a building or structure shall furnish or erect, or cause to be furnished or erected for the performance of such labor, scaffolding, hoists, stays, ladders, slings, hangers, blocks, pulleys, braces, irons, ropes, and other devices which shall be so constructed, placed and operated as to give proper protection to a person so employed.”
In effect, the 1969 amendment substituted “ All contractors and owners and their agents” for “A person employing or directing another to perform labor of any kind”; and the reference to a person “ directing” or “ directed” to perform labor was also deleted, so that the reference in the amended statute is only to “ a person so employed ’ ’. In general, there is now imposed upon “ all contractors and owners and their agents ” the absolute duty to furnish a safe scaffold in connection with buildings and structures. They are liable if the scaffold proves to be unsafe and the servant is injured.
Prior to the amendment, an owner, who engaged the services of an independent contractor, was insulated from liability in the event of1 an accident due to a defective scaffold or other device. Consequently, no responsibility would attach unless the owner exercised some kind of control, supervision or direction of the work being conducted by an injured workman’s employer. (See Boraski v. Backer, 32 A D 2d 577; Thomas v. New York City Housing Auth., 28 Misc 2d 289, affd. 8 A D 2d 789, affd. 9 N Y 2d 625; Overton v. Gerard, 2 A D 2d 410.)
In the case at bar, it is undisputed that defendant had no control over the performance of the work and, since no decisional law has been uncovered dealing with post-1969 accidents, State’s counsel has placed great reliance on the legal principles enunciated by our appellate courts as applied to former section 240. Additionally, the position advanced is that the Legislature never intended to make an owner an insurer for the benefit of employees working at a construction site.
The legislative history of the 1969 amendment (L. 1969, ch. 1108) may be found by referring to Senate Bill 2091-A. The accompanying memorandum (N. Y. Legis. Annual, 1969, p. 407) makes it apparent that the amendment was designed to extend the existing liability imposed under section 240 by including “ owners ” in addition to those previously responsible. Since *297 the case at bar involves a statute not yet tested in our courts and the issue presented is novel, relevant portions of the aforementioned memorandum are repeated here in length:
“ Labor Law, $240; $241, repeal, new. This bill places ultimate responsibility for safety practices at building construction jobs where such responsibility actually belongs, on the owner and general contractor.
“ The Labor Law was enacted for the sole purpose of1 protecting workmen. The courts have consistently held that the owner and general contractor have a non-delegable duty to provide, a safe place to work for all workmen on the job. The owner and general contractor have the prime contract and interest in completing the work. They choose the subcontractors and coordinate the work and, in addition, have overall supervision of all the work. They are primarily responsible for the erection of the building.
‘ ‘ However, under the present interpretation of the law a subcontractor, because he is named in Sections 240 and 241 and even though his concern with the construction project may be quite limited, can relieve the owner or general contractor of liability for safe work practices merely by securing the basic workmen’s compensation coverage.
‘ ‘ Under the present sections an owner and/or contractor would be inclined to choose a subcontractor predicated on price, disregarding the subcontractor’s safety measures. This, of course, is dangerous to the welfare and health of the men working on the project and would defeat the original intent of the Labor Law.
‘ ‘ The owner and general contractor can protect themselves against liability caused by the subcontractor’s carelessness by a contractual indemnification agreement which is commonplace. In other words, the owner or general contractor would have an undelegable duty to the workmen and could be indemnified contractually by the subcontractor for any violation that the subcontractor may cause.
“ The bill restores to the owner and general contractor the responsibility, where it properly belongs, in their selection of subcontractors and in the progress of the work in regard to the safety of all men on the job * * *
“ These laios were supposed to be enacted specifically for the protection of these workers.” (Emphasis added.)
As previously mentioned, no cases have been found which would lend an interpretation to section 240 since its amendment in 1969. However, in an action brought against the owner *298 of a building iby a contractor’s employee, under sections 200, 241 and 241-a of the Labor Law-(Horan v. Dormitory Authority, Sup. Ct., Albany County, Oct. 17, 1972, mod. 43 A D 2d 65 [3d Dept., Nov. 29, 1973]), the Appellate Division affirmed the trial court’s directed verdict against the owner for a violation of section 241-a. There, the court rejected appellant’s argument that an owner can be held liable only if he has direction and control of the work. The reasoning advanced was substantially taken from Haskins v. City of New York (28 A D 2d 656, 657) where that court stated: “Section 241-a employs broad and all-inclusive language. Clearly designed to broaden the cloak of protection to all workers engaged in the hazards of work near stairwells, it affects all those having the over-all responsibility for the demolition of a building. In this case, the city. "While section 240 of the Labor Law may not apply to an owner who engages an independent contractor to perform the work, section 241 does impose a nondelegable duty on owners, making them liable for its violation even though the work is being performed by an independent contractor. (See Bruno v. Almar Residences Corp., 13 A D 2d 232, 236, affd. 11 N Y 2d 988.)”
The Haskins case was decided in 1967 at a time when the applicable law, namely, section 241, by its very language, imposed a duty upon “ owners ” and section 240 did not. By reason of the 1969 amendment, we believe that section 240 likewise casts on the owner a nondelegable duty to provide proper protection to a worker. We also believe that said duty is absolute and cannot be avoided even though the worker is injured because of unsafe working conditions created by his employer, who, as in the case at hand, is an independent contractor. Indeed, this rationale seems to have abundant support from the Legislature who clearly intended to enlarge the class of those accountable under the statute. To reason otherwise would lend an illogical analysis to the 1969 amendment.
Interestingly, in both Horan and Haskins (supra), the- diiP senting opinions were based, in part, upon the principle that an owner, absent control, should not be responsible for a workman’s injuries. It .was respectively urged that this “could clearly not -have been the intent of the Legislature ”; and “ such a burden should not be imposed without strict legislative direction ”. It is our opinion that the “ intent ” and “ direction ”, alluded to above, has now come into being.
Accordingly, we conclude that section 240 of the Labor Law is applicable to the instant situation and the State is in vio *299 lation of a nondelegable duty imposed thereunder. Further, since this is a statutory violation, contributory negligence may not be raised as a defense (Koenig v. Patrick Constr. Corp., 298 N. Y. 313; Melzer v. 195 Broadway Corp., 17 A D 2d 656). Notwithstanding, we note, parenthetically, that no evidence of claimant’s negligence has been presented in this record.
Additionally, we find the State, as owner, has failed to comply with the specific requirements or general intent of the Industrial Code, to wit, subdivision (c) and paragraph (1) of subdivision (e) of section 23.T2.
Factually, the State does not here contest violations of the code, or, for that matter, violations of section 240. However, it is argued that the rules and regulations promulgated in the code have no bearing upon a claim brought under section 240 of the Labor Law. The basis for this contention is that no authority to establish said rules and regulations is specifically set forth in the aforesaid statute; as found in section 241. We find this argument wholly untenable. A reading of section 27-a of the Labor Law indicates that the Board of Standards and Appeals shall have the power to make, amend and repeal rules for carrying into effect the provisions of this chapter, applying such provisions to specific conditions and prescribing means, methods and practices to effectuate such provisions. (Also, see now, Industrial Code, § 23-1; 12 NYCBB Subpart 23-1.) Clearly, the code is applicable to section 240 or any other statute incorporated in the Labor Law.
The record before this court sufficiently establishes that the scaffold upon which claimant was working did not provide proper protection in that it was negligently constructed. The collapse thereof was the sole and proximate cause of Adeline Bocha’s injuries and the State, by reason of its violations of section 240 of the Labor Law and the Industrial Code, is therefore answerable in damages. [Matter with respect to injuries sustained by Adeline Bocha omitted.]
Based on this trial record, we believe and so find that Adeline Bocha is unemployable and had a work expectancy of about 30 years at the trial date. That he will require surgery in an attempt to alleviate the deteriorating conditions found in his bladder, urethra and kidneys. Although post-operative nursing care may be required, the court is not entirely convinced that Mrs. Bocha will not be able to tend her husband’s needs as she has since his release from the hospital. We realize that this would be a hardship insofar as she is concerned, however, the following, excerpt from Mrs. Bocha’s testimony, as *300 read into the record by an interpreter, well demonstrates her devotion and ability:
“ Q. From August, 1970, until now, how many times have you given him an enema, about!1
‘ ‘ A. Maybe 3000. Because I gave it to him the first time — it doesn’t take because the water come right out. iSo I have to give him 7 or 10 for him to be able to do it. The first time I >give it wafer comes right out, as I said, and sometimes it comes out with things that look like little blood. And then as I gave it, it’s just about the same but a little bit comes out, arid then it comes out with a bit of stool.”
In addition to caring for her two children, ages five and nine, Mrs. Bocha has also been assisting her husband on a daily basis: “ I help him to dress. I help him to take a bath. I help him to urinate with the towels. I give him the enemas to allow him to move his bowels. And, naturally, I help him to get up and sit down in the bathroom. ’ ’
We further find that Adeline Bocha is impotent and will most likely remain so for the rest of his life. That he will continue to live with pain and will never be able to ambulate without the use of crutches. It .is noted that we carefully observed claimant in the courtroom and while he was testifying. He was never able to sit or stand for a period of more than 15 minutes and was constantly twisting and turning. His anxiety, pain and discomfort were most obvious. In the true sense, he will never again be a father to his children or a husband to his wife. There can be no question that his dreams of finding a new life and brighter horizons when he chose to come to this country have been shattered.
In assessing damages, we have considered, among other things, the mental and physical suffering which Mr. Bocha has endured and will continue to endure for the remainder of his life. He has a life expectancy of approximately 40 years, depending upon the successfulness of the operative procedure hereinbefore described. We must assume that same will offer some help in giving claimant the courage and tenacity to face a very difficult future.
Throughout this writing, we have alluded to claimant’s special damages and, as supported in the record, the court finds total special damages of $228,000. This sum is made up of past and future loss of earnings ($210,000) and past and future medical expenses ($18,000). In addition to the above-stated amount, the court awards claimant the sum of $300,000 for conscious pain and suffering, both physical and mental; permanent injuries; *301 humiliation; and all other general damages. We therefore determine that Adelino Rocha is entitled to a total award of $528,000.
In dealing with Maria Rocha’s derivative action for loss of services and consortium, it is noted that any. such action had previously ibeen barred. However, in a relatively recent case (Millington v. Southeastern Elevator Co., 22 N Y 2d 498), the Court of Appeals allowed a wife to bring an action for loss of consortium. In so doing, the court said (pp. 502-503): 11 The concept of consortium includes not only loss of support or services, it also embraces such elements as love, companionship, affection, society, sexual relations, solace and more. * * * Consequently the interest sought to be protected is personal to the wife. It is the interest which may have turned a happily married woman into a life-long nurse and deprived her of the opportunity of rearing children. Disparagingly described as 1 sentimental ’ or ‘ parasitic ’ damages, the mental and emotional anguish caused by seeing a healthy, loving companionable mate turned into a shell of a person is real enough. * * * The loss of1 companionship, emotional support, love, felicity and sexual relations are real injuries. The trauma of having to care for a .permanent invalid is known to have caused mental illness. There may not be a deterioration in the marital relationship, but it will certainly alter it in a tragic way.”
Maria Rocha was .28 years of age at the time of the accident and was living with her husband in a harmonious relationship since their marriage in 1963. ¡ -She is a relatively attractive woman, neat in appearance and humble in her manner. We have every reason to believe that she will continue to live with her husband and tend to his everyday needs. Additionally, she must take his place in rearing the children, as evidenced by the following excerpt: “ He played with them. He spoke with them. Now he can’t do ¡anything even. Sometimes he has such pain he can’t even talk to them. 'Sometimes the pain is so bad that he appears crazy.” Mrs. .Rocha further testified that she has had no sexual relations with her husband since August, 1970 and, based upon the medical evidence, it is reasonable to assume that she will be so deprived thereof for the remainder of her life.
It is indeed difficult to measure the pecuniary loss sustained by Maria Rocha. However, after giving due consideration to the over-all evidence and taking into account the mental and physical problems with which ¡she will be confronted for the rest of her days, we believe that the sum of $50,000 would be fair and just compensation.
*302 Accordingly, claimant, Adeline Rocha, is awarded the sum of $528,000; and claimant, :Maria Rocha, is awarded the sum of $50,000.
All motions made- ¡by the defendant at .the conclusion of claimants’ case and at the close of evidence, upon which decision was reserved, are now denied.
•This writing ¡constitutes the decision of the court in compliance with CPLR 4213 and the Clerk is directed to enter judgment accordingly.

. It should be noted that during trial the words “ platform ” and “ scaffold ” were used interchangeably and the legal significance attached thereto is discussed later in this writing.

. Any liability predicated upon violations of section 241 of the Labor Law and allegations of common-law negligence, as incorporated in claimants’ bills of particulars, was withdrawn during trial.