OPINION OF THE COURT
Gerard M. Weisberg, J.
The defendants (hereinafter collectively referred to as "State”) have moved to dismiss this claim, contending that it fails to state a cause of action (CPLR 3211, subd [a], par 7), that the Court of Claims lacks jurisdiction over the subject matter of the action (CPLR 3211, subd [a], par 2), and that the claim is untimely (Court of Claims Act, § 10, subd 4). Claimant has cross-moved for summary judgment and for permission to file a late claim (CPLR 3212; Court of Claims Act, § 10, subd 6).
The claim is predicated upon article 3-A of the Lien Law *143 which provides that all funds paid to a contractor in connection with the improvement of real property constitute assets of a trust for the benefits of subcontractors, laborers, material-men, tax claimants and their subrogees. Section 77 of the Lien Law states that a cause of action may be maintained by trust beneficiaries to enforce the trust, to set aside diversions of trust assets, to recover money damages and for various other types of relief. Procedurally, the action is required to conform "as nearly as may be to the practice, pleadings, forms and procedure in a class action.” (Lien Law, § 77, subd 1.)
In December, 1973 and February, 1974, Electorque Associates, Inc. (Electorque) contracted to perform electrical work for the New York City Board of Education (Board) in connection with the construction of I.S. 324 and I.S. 383 in Brooklyn, New York (Contracts Nos. 221416 and 222044). St! Paul Fire and Marine Insurance Company (St. Paul) executed performance and payment bonds in connection therewith as Electorque’s surety in the amount of $2,002,000. Subsequently, on June 17, 1975, Electorque was declared in default and St. Paul was called upon to complete the contracts. St. Paul thereafter engaged the Sheldon Electric Company, Inc., and the David Coyne Co., Inc., to complete the contracts for the sums of $164,187.80 and $59,002.57, respectively. Claimant also disbursed $110,348.01 to unpaid subcontractors, laborers and materialmen of Electorque.
The gravamen of the claim is that prior to Electorque’s default, the State levied upon contract balances due from the Board to pay taxes accrued by Electorque in the. sum of $169,561.64. The State has furnished the court with an affidavit which indicates that at least $77,700.51 was received by the State from tax levies upon the Board on October 22, 1974 and March 25, 1975, which funds were applied to Electorque’s outstanding tax liability. The State denies knowledge of the source of any other funds paid to it by Electorque, stating merely that it was paid by check.
The State’s liability is predicated on the theory that St. Paul is a beneficiary of an article 3-A trust, the assets of which comprise all sums due or received by Electorque from the Board, that Electorque had no proprietary interest in these funds except as trustee, and that consequently, the State’s tax levies were invalid. Further, St. Paul contends that the State’s entitlement to trust assets is limited to taxes accrued specifically in connection with Contracts 221416 and *144 222044, and that the amounts actually collected by the State out of Board payments exceeded that amount. The State admits that Electorque’s tax liability was never computed on a job-by-job basis and that the precise amount of taxes accrued under these contracts has never been administratively determined because the tax forms do not request such information.
The rights and liabilities of the parties are governed by Aquilino v United States of Amer. (10 NY2d 271). In that case, the Federal Government filed a tax lien against a general contractor for unpaid Social Security and withholding taxes. The court stated, per Judge Fuld, at page 282: "as a matter of New York law, a contractor does not have a sufficient beneficial interest in the moneys, due or to become due from the owner under the contract, to give him a property right in them, except insofar as there is a balance remaining after all subcontractors and other statutory beneficiaries have been paid. This being so, it follows that the tax lien herein asserted by the Government against the property of the contractor-taxpayer is ineffective to reach such moneys and that the plaintiff subcontractors are entitled to the court-deposited fund.”
The State correctly points out that Aquilino was decided under the Lien Law as it existed prior to 1959, and that subsequently, the State was designated a trust beneficiary to the extent of unpaid taxes, and was given a priority in distribution of trust assets. (Lien Law, § 77, subd 8; L 1959, ch 696, § 2.) Possibly, these statutory changes would have necessitated a different disposition of the funds in Aquilino. Nevertheless, under the present statute, tax claimants are only beneficiaries to the extent of taxes accrued on the particular job which is the subject of the trust. (Harman v Fairview Assoc., 25 NY2d 101; Lien Law, § 71, subd 2, par [c].) Consequently, trust assets are not available for payment of the general contractor’s tax liability arising from any other sources. To this end, the Lien Law requires that separate books and/or accounts be kept by the contractor indicating the beneficiaries of each trust and to whom payments have been made. (Lien Law, § 75; Caristo Constr. Corp. v Diners Fin. Corp., 21 NY2d 507, 512.) Each trust is a separate entity composed of all funds paid by an owner to anyone in satisfaction of the contract. (Onondaga Commercial Dry Wall Corp. v 150 Clinton St., 25 NY2d 106.) Therefore, the statement in Aquilino that the general contractor possesses no proprietary *145 rights in the trust assets which can be subject to a tax levy is still a viable principle. Stated another way, present proceeds may not be applied to the past debts of the contractor. (General Crushed Stone Co. v State of New York, 23 AD2d 250.)
St. Paul’s claim is precisely that funds paid by the Board under Contracts 221416 and 222044 were used to satisfy Electorque’s tax liability arising, at least in part, from activities unconnected with those contracts. As indicated in Caristo (supra, p 512): "Persons dealing with those handling trust funds, who may be charged with notice of the trust, may share in liability for unlawful diversions (§§ 72, 73, 79-a).” Accordingly, the allegations of the claim state a cause of action for diversion of trust assets under article 3-A of the Lien Law.
The State argues, however, that St. Paul has no subrogation rights to the trust fund since in its view the "completion contractors”, i.e., those contractors whom St. Paul commissioned to complete the contracts after Electorque’s default, are not beneficiaries of the fund. This assertion is premised on the lack of contractual relations between Electorque and the completion contractors and the fact that the alleged diversions took place prior to default.
This theory is totally erroneous. As Justice Helman stated in National Sur. Corp. v Fishkill Nat. Bank (61 Misc 2d 579, 581): "Since every public improvement contract is bonded, the surety succeeds to the right of his principal, under well-established legal doctrines, from the date of the execution of the bond. [Citations omitted.] In addition to its common-law rights of exoneration and indemnification, the surety has been authorized by section 77 of the Lien Law, upon effecting its payment to an obligee or beneficiary, to turn toward an alleged diverter to seek recovery for the diversion of moneys appropriated for the particular improvement, and is thus enabled to prosecute a trust fund action as if it were itself one of the stated beneficiaries.” There is no necessity for privity of contract among the various beneficiaries or between the defaulting general contractor and the surety’s completion contractors. As Judge Bergan stated in Onondaga Commercial Dry Wall Corp. (supra, p 111): "Certainly money paid by the owner to anyone in satisfaction of the contract would be impressed with this broadly inclusive trust.” (Emphasis added; see, also, Wilson v Moon, 240 App Div 440, affd 265 NY 640; *146 Carpenter’s Backhoe & Dozer Serv. v Dewittsburg Housing Dev. Fund Corp., 66 AD2d 916.)
The completion subcontractors are no less beneficiaries of the trust than those commissioned by Electorque. St. Paul, as their subrogee, is therefore empowered to maintain this action. We also note that St. Paul has alleged that it paid a number of Electorque’s subcontractors the sum of $110,348.01. This allegation alone establishes St. Paul’s standing. The State’s motion to dismiss the claim under CPLR 3211 (subd [a], par 7) is therefore denied.
The State further contends that the claim is untimely. Defendants’ position is that the present action is governed by subdivision 4 of section 10 of the Court of Claims Act ("any other claims not otherwise provided for by this section”), which requires that a claim or notice of intention be filed within six months after accrual, and that if a mere notice of intention is filed, that the claim itself be filed within two years after accrual. The State argues that this claim accrued no later than May 20, 1975, the date on which the last levy upon trust funds was made.
The facts as alleged are that the wrongful levies by the State took place between December 7, 1973 and May 20, 1975. Electorque was declared in default of its contract on June 17, 1975, activating St. Paul’s obligations under the performance bonds. St. Paul thereupon undertook to complete performance under the construction contracts with the Board, paying various sums to its subcontractors and incurring further tax liabilities. The contracts were substantially completed in September, 1977, although St. Paul indicates that all accounts under the contract have not as yet been settled. Meanwhile, on September 30, 1976, St. Paul served and filed a document entitled "Notice of Intention to File Claim, Notice of Contingent Claim and Verified Contingent Claim.”[1] Judgment was demanded in the sum of $1,706,748.65, this figure representing a major portion of St. Paul’s potential liability under the performance bonds. Thereafter, on May 11, 1978, the claim was filed, seeking as damages the considerably smaller sum of $169,561.64, upon precisely the same theory as alleged in its notice of intention.
The issue presented is: when did St. Paul’s claim accrue? *147 We must reject the . State’s contention that the claim accrued when the levies took place. It is quite clear that St. Paul had no cause of action during the period from December 7, 1973 until May 20, 1975, since the contracts had not yet been declared in default and, therefore, St. Paul possessed no recognizable subrogation rights. Moreover, it was held in Matter of Aetna Cas. & Sur. Co. v State of New York (92 Misc 2d 249) that a cause of action derived from a right of subrogation accrues when payment is made by the potential subrogee. The court’s analysis in Aetna was predicated on Bay Ridge Air Rights v State of New York (44 NY2d 49) in which it was held that causes of action for indemnification and contribution accrue upon payment of a judgment or settlement. The Court of Appeals in Bay Ridge specifically rejected the argument raised here by the State that the underlying wrongful act commences the running of the notice periods prescribed in section 10 of the Court of Claims Act.
To these considerations, it must be added that the expression "claim accrues” is not necessarily synonymous with "cause of action accrues.” (Dufel v State of New York, 198 App Div 97, 102.) A claim accrues when the amount of damages is ascertainable, or when claimant possesses the legal right to enforce its claim in court. (City of New York v State of New York, 40 NY2d 659; Taylor v State of New York, 302 NY 177; Terrace Hotel Co. v State of New York, 19 AD2d 434.) In St. Paul’s case, the extent of its subrogation rights did not become fixed until the construction projects were substantially completed in September, 1977. Claimant’s full interest in the trust assets, and consequently, the extent of its damages, was not previously ascertainable. Moreover, until the date of actual completion, additional tax liabilities were being incurred by St. Paul which the State contends are a setoff against the funds allegedly diverted by the State. We note further that subdivision 2 of section 77 of the Lien Law prescribes a one-year Statute of Limitations for actions arising under article 3-A, which period commences from the completion of the improvement. Though not strictly binding upon this court’s analysis of subdivision 4 of section 10 of the Court of Claims Act, the Lien Law accrual date is clearly indicative of the Legislature’s judgment on this issue. We find this judgment to be highly persuasive.
It is clear, however, that St. Paul did not file its claim within six months after September, 1977. The question is *148 whether the filing of a notice of intention on September 30, 1976, prior to the accrual of the claim, was sufficient to preserve its rights under the statute, thereby affording claimant two years from the date of accrual to file its claim.
The purpose of the filing requirements of section 10 of the Court of Claims Act is to provide notice to the State of claims against it, and of claims intended to be filed in the future. This is the prime consideration in determining whether substantial compliance with the statute has been made. Consequently, the fact that claimant may have lacked legal capacity to file a claim at the time the notice of intention was filed, or that such claim had not technically "accrued” does not detract in the slightest from its effectiveness in providing notice to the State. This point was clearly made in Matter of Johnson v State of New York (49 AD2d 136), wherein a notice of intention in a wrongful death claim was held valid, notwithstanding claimant’s failure to secure appointment as executor or administrator at the time of filing. (See, also, Atlantic Mut. Ins. Co. v State of New York, 50 AD2d 356, affd 41 NY2d 884.)
The notice of intention filed by St. Paul on September 30, 1976 was therefore effective under subdivision 4 of section 10 of the Court of Claims Act, to extend claimant’s time to file until two years from the date of accrual. The claim was filed on May 11, 1978, approximately nine months after completion of the project. Accordingly, the claim was timely filed.
The State’s objections to this court’s jurisdiction comprise two main contentions: (1) that the remedy prescribed by article 3-A of the Lien Law is to "enforce a trust”, and that the court’s jurisdiction is limited by section 9 of the Court of Claims Act to claims for appropriation, breach of contract and torts of State officers or employees; and (2) that jurisdiction over enforcement of trusts has historically resided in courts of equity, that no action "at law” lies herein, and that the Court of Claims does not possess "general equity jurisdiction”. Claimant argues that causes of action for conversion, for money had and received and de facto appropriation are stated, though not explicitly, and that consequently the court has jurisdiction.
Whether the acts authorized by section 77 of the Lien Law can be construed under the rubrics of tort and/or implied
*149 contract presents formidable semantic difficulties.[2] Historically, an action to enforce a trust has not been regarded as sounding in either tort or contract, although the "law courts” did entertain damage suits arising out of the trust relationship. Pollock and Maitland[3] indicate that the common-law "use” of money or chattels involved rights and duties which the law sanctioned "without the help of any equity”. Bogart, Trusts (2d ed, § 3) suggests, however, that these were not true trusts, and that the interests of beneficiaries began to be enforced by the Chancellor during the 15th Century. Actions at law did lie in the following cases: (1) where the trustee transferred property to a third person with notice of the trust who failed to pay value (conversion, implied contract), (2) where the trust was purely passive in nature, (3) where the claim had been reduced to an account stated, and (4) where the trustee had transferred money or a chattel to a third person in violation of the trust and the beneficiary was entitled to the immediate transfer thereof from the trustee. (4 Scott, Trusts [3d ed], §§291, 294.1.) In such cases, plaintiff could elect to proceed by way of an action at law or bill in equity. (See, generally, Trusts — Legal or Equitable Remedy, Ann. 171 ALR 429.)
The New York authorities establish that a remedy at law exists for the type of injury suffered by St. Paul. In Empire Sq. Realty Co. v Chase Nat. Bank of City of N. Y. (181 Misc 752, affd 267 App Div 817, mot for lv to app den 267 App Div 901), plaintiff corporation sought an accounting by the defendant bank alleging that plaintiff’s president had wrongfully paid personal debts to the defendant out of funds of the corporation. The court stated at 181 Misc p 754: "The acts charged to the defendants constitute an injury to property (Mintzer case supra)[4] for which a cause of action at law could be maintained for fraud, for conversion or for money had and received (Quintal v. Kellner, 264 N. Y. 32, 33; Beeber v. Empire Power Corp., 31 N. Y. S. 2d 914, and cases there cited)”. In Squier v Houghton (131 Misc 129), plaintiff alleged that the executors and trustees of two estates, from which he had received remainder interests, had wrongfully withheld *150 and/or transferred his interests to third parties. Concerning these trustees, the court stated at page 132: "The cause of action against the corporate defendants is either on implied contract or on the theory that they have knowingly assisted in a breach of trust”.
The legal remedy may in some cases be less effective and complete than that which a court of equity can afford. (Falk v Hoffman, 233 NY 199.) The plaintiff cannot however be precluded from exercising whatever legal remedies do exist if that is his election.
The existence of a tort remedy for violation of article 3-A of the Lien Law has been established by Fleck v Perla (40 AD2d 1069, 1070) wherein the court stated: "In addition to the statutory authority for the plaintiffs right to proceed against a transferee of trust assets, the case law clearly holds that 'One who receives property, knowing it to be the subject of a trust, and to have been transferred in violation of the trustee’s duty or power, takes it subject to the right of the trustee, and also of the cestui que trust, to reclaim possession thereof, or to recover for its conversion (Zimmerman v. Kinkle, 108 N. Y. 282, 287; other authorities omitted).’ ”
This case indicates that the legal remedies incident to trusts at common law are applicable to article 3-A of the Lien. Law trusts, and that an action under section 77 of the Lien Law is not the exclusive method of enforcement. An additional theory of tort relief exists by virtue of the doctrine of violation of statute. Subdivision 2 of section 72 of the Lien Law specifically prohibits levying upon trust assets as the individual property of the trustee. Since claimant is within the class of persons for whose protection the statute was enacted, a civil action exists for its violation.
Significantly, however, the claim invokes the statute and not the common law as the grounds for relief. Indeed, the claim is brought as a class action as the statute requires, and the nomenclature of article 3-A is employed throughout. The question is, therefore, whether the Court of Claims possesses jurisdiction over an action styled as one arising under section 77 of the Lien Law. Section 9 of the Court of Claims Act does not refer to statutory actions of any kind.[5] Nevertheless, *151 statutory causes of action, such as those for contribution (CPLR art 14), indemnification (Public Officers Law, § 17), violation of section 240 of the Labor Law and section 51 of the Civil Rights Law, and subrogation under section 29 of the Workers’ Compensation Law, are cognizable in this court. (Bay Ridge Air Rights v State of New York, 44 NY2d 49, supra; Lapidot v State of New York, 88 Misc 2d 1090; Rocha v State of New York, 77 Misc 2d 290, affd 45 AD2d 633; Seidelman v State of New York, 202 Misc 817; Atlantic Mut. Ins. Co. v State of New York, 50 AD2d 356, supra; see, also, Amato v State of New York, 170 Misc 136, holding that the Court of Claims has power to adjudicate the amount of attorneys’ fees allowable in actions tried before it under Judiciary Law, § 474.) The foregoing remedies did not exist at common law, at least in their present form, and this court’s jurisdiction over such actions clearly cannot be predicated on such hypothetical considerations as how the common law would have classified them if they had existed. On the contrary, the court’s jurisdiction proceeds directly from the statutes themselves albeit by implication, in conjunction with section 9 of article VI of the New York State Constitution, and the waiver of sovereign immunity contained in section 8 of the Court of Claims Act which provides in part: "The state hereby waives its immunity from liability and action and hereby assumes liability and consents to have the same determined in accordance with the same rules of law as applied to actions in the supreme court against individuals or corporations, provided the claimant complies with the limitations of this article.”
This view is necessitated by several factors. Throughout most of its history, the Court of Claims was strictly a legislative creation. Presently, however, the court derives its powers directly from the New York State Constitution which provides in relevant part: "The court shall have jurisdiction to hear and determine claims against the state or by the state against the claimant or between conflicting claimants as the legislature may provide.” (NY Const, art VI, § 9, eff Sept. 1, 1962.)
This court’s jurisdiction over claims against the State is exclusive (Psaty v Duryea, 306 NY 413), except in rare instances not relevant here where jurisdiction is conferred upon the Supreme Court by statute or judicial decision (see, e.g., declaratory judgment, CPLR 3001; Hallock v State of New York, 39 AD2d 172, affd 32 NY2d 599; Frank v State of New York, 61 AD2d 466, affd 44 NY2d 687; claim to real property, *152 Real Property Actions and Proceedings Law, § 1541; Montgomery Ward & Co. v People, 279 App Div 85, affd 304 NY 646; preliminary injunction, CPLR 6311), or insofar as the subject matter is cognizable by way of article 78 proceedings. Barring the application of the foregoing exceptions, a claim against the State must be justiciable in the Court of Claims or else it is not justiciable at all. To say that no action may be brought against the State because no court can hear it is the equivalent of saying that sovereign immunity has not been waived in relation thereto and, consequently, that in a particular case the State cannot be held liable. (See Van Bortel v Schuler, 83 Misc 2d 221.) It is not conceivable, however, that the Legislature should create a liability to which the State is subject and there be no forum available for its enforcement. The State plays a critical role in the article 3-A statutory scheme. Indeed, the conduct complained of by St. Paul is specifically prohibited by subdivision 2 of section 72 of the Lien Law. The conclusion is inescapable that the Legislature did not intend the State to remain immune from suit under article 3-A. The only question is: in what forum? The Constitution gives a clear answer: in the Court of Claims. We therefore hold that where the State is not excluded from the purview of new forms of statutory liability, the waiver of sovereign immunity in section 8 of the Court of Claims Act, and the provisions of the New York State Constitution previously mentioned are sufficient to confer jurisdiction upon the Court of Claims.
Concerning the State’s argument that: (1) trusts are creatures of equity, and (2) that the Court of Claims possesses no "general” equity jurisdiction, the first of these propositions .is correct although as previously indicated, both legal and equitable causes of action were recognized in relation thereto. This does not mean however that an action under section 77 of the Lien Law is necessarily equitable in nature notwithstanding the trust terminology employed, since both money damages and injunctive relief are authorized by the statute. Moreover, the trust created by article 3-A of the Lien Law is not a creation of equity courts, but is rather a child of the Legislature. As the courts pointed out in Gramatan-Sullivan, Inc. v Koslow (240 F2d 523, 525) and Aquilino (10 NY2d 271, 280, supra), the incidents of the statutory trust are different from those pertaining to private trusts since: "(1) * * * the contractor-trustee is not under the necessity of holding the fund intact until the improvement is completed, required as *153 he is to pay the claims of the subcontractors as they mature; (2) * * * the contractor-trustee may, under specified conditions, assign his rights to future payments due from an owner (Lien Law, § 13, subd. [1-a]; Arrow Iron Works v Greene, 260 N. Y. 330, 340); (3) * * * the contractor-trustee is privileged to commingle funds (Lien Law, § 36-a); and (4) * * * the remedy available is a class action rather than one prosecutable by an individual (Lien Law, § 71).”
The usefulness of making legal versus equitable distinctions in this context is therefore highly suspect. Since the merger of law and equity in New York, the primary relevance of such an inquiry is in relation to the right to trial by jury. There is, however, no such right in any case where the State is a defendant.
The extreme position that the Court of Claims is strictly a law court is not substantiated by the Court of Claims Act. Quite the reverse is true, as indicated by subdivision 1 of section 12 of the Court of Claims Act, which provides in part: "No judgment shall be granted on any claim against the state except upon such legal evidence as would establish the liability against an individual or corporation in a court of law or equity.” (Emphasis added.) Section 9 of the Court of Claims Act specifically confers jurisdiction in cases of implied contract, a classification which includes quasi-contractual actions founded upon the equitable doctrine of unjust enrichment. (Miller v Schloss, 218 NY 400.) The recent case of Community Nat. Bank & Trust Co. of N. Y. v State of New York (68 AD2d 999), involved the State Tax Commission’s wrongful sale of property subject to claimant’s security interest. The Appellate Division sustained, the filing in this court, and held apparently "meritorious” a late claim which stated a cause of action for unjust enrichment.
The expression that the Court of Claims lacks "general” equity jurisdiction must therefore be analyzed to determine what limitations are intended. In Becker & Assoc. v State of New York (65 AD2d 65), claimant sought to recover the value of physicians’ services rendered pursuant to an agreement with the State University of New York. This agreement was never approved by the Comptroller of the State of New York as required by section 112 of the State Finance Law, therefore precluding a recovery based on contract. (See Blatt Bowling & Billiard Corp. v State of New York, 14 AD2d 144.) The trial court nevertheless applied equitable considerations and *154 granted judgment in claimant’s favor. On appeal, the State argued that the Court of Claims lacked such equity jurisdiction, a proposition which was assented to by the Appellate Division in its reversal of the judgment below. The meaning of this reference to equity must however be comprehended in the light of the ratio decidendi of Becker which was that the Court of Claims could not circumvent section 112 of the State Finance Law simply because it appeared equitable, i.e., just or moral, to do so. Such a course would deprive the public of the protection which the law was intended to provide. One may reasonably ask, however, to what degree the Supreme Court could exercise such a power to circumvent statutory policy although it clearly possesses "general equity jurisdiction.” The implication here is of a departure from law entirely which would be outside the jurisdiction of any court, not just the Court of Claims. There are such things as purely moral claims, i.e., claims which have no basis in law per se, and the Court of Claims is the sole forum for such actions against the State. The Legislature must, however, recognize the validity of each claim by special bill; hence, the prohibition against implied liability contained in section 12 of the Court of Claims Act.
Significantly, the Court of Appeals has taken the position that: "in determining claims for money damages against the State, the Court of Claims may apply equitable considerations and perhaps, to some extent, may grant some sort of incidental equitable relief’. (Psaty v Duryea, 306 NY 413, 417, supra.) This formulation has received varying interpretations. In Wilson v State of New York (73 Misc 2d 931), claimant sought an order directing the State to pay interest upon a judgment of the Court of Claims, which motion was opposed by the State on the theory that such relief was purely equitable in nature. The court (Adolph C. Orlando, J.) construed Psaty as authorizing such relief, referring to the State’s position regarding the absence of equitable power as a "sterile cliche” (Wilson, supra, p 933). In Silverman v Comptroller of State of N. Y. (69 Misc 2d 52), claimant moved to compel the Comptroller to deposit into court the amount of an offer for advance payment in an appropriation case. Holding that such a motion was in the nature of a "mandamus”, the court refused to take jurisdiction, saying at page 54: "it [Court of Claims] has no equitable power except where relief is incidental to enforcement of judgments for money damages.” (See, also, Montgomery v State of New York, 69 Misc 2d 127.)
*155 The Silverman case is subject to criticism on two grounds. First it takes an unnecessarily narrow view of Psaty v Duryea (306 NY 413, supra) wherein the terms "equitable considerations” and "incidental equitable relief’ were employed despite the absence of any issue regarding enforcement of money judgments. Second, Silverman appears to be premised on the erroneous theory that mandamus is an equity action. On the contrary, "mandamus is essentially a common-law remedy unknown to the equity practice.” (55 CJS, Mandamus, § 2; see Duncan Townsite Co. v Lane, 245 US 308; Matter of Coombs v Edwards, 280 NY 361.) Nevertheless, the phraseology employed in Silverman has been repeated in subsequent cases. In Police Benevolent Assn. of N. Y. State Police v State of New York (79 Misc 2d 334) claimant sought specific performance of a provision contained in a collective bargaining agreement. The court held (Edward J. Amann, Jr., J.) that the Court of Claims could not order specific performance, such relief being equitable in nature, citing Silverman as authority. (See, also, Davidson v State Narcotic Addiction Control Comm., 81 Misc 2d 953.)
A different formulation was employed in Van Bortel v Schuler (83 Misc 2d 221, supra) in which petitioner brought an article 78 proceeding, seeking an injunction against the State’s threatened destruction of access to his property. The court denied such relief upon the ground that sovereign immunity had not been waived in relation thereto saying additionally that (p 223) "[u]nless a claim for damage is the primary request for relief, within the jurisdiction of the [C]ourt [of Claims], it is well settled that the Court of Claims is without equitable jurisdiction” (authorities omitted). This formulation appears closer to the Court of Appeals thinking in Psaty (306 NY 413, supra) than Silverman (supra) and its progeny. Significantly, it was the Psaty test which the court employed in Doe v State of New York (86 Misc 2d 639) in which claimant brought an action for damages arising from the unauthorized release of his youthful offender status in violation of CPL 720.35 and, in addition, sought to enjoin future disclosures. Denying the latter relief, the court (Frank S. Rossetti, J.) said (p 641): "we fail to see how an injunction against future violations of a statute can be considered incidental to a money damage action for past violations thereof.”
It must be observed that the jurisdictional limitations delineated by the foregoing authorities primarily concern the forms *156 of relief available in this court, and not the theories of liability which may be advanced. The distinctions between legal and equitable theories of liability are in any case frequently blurred. As Justice Oliver Wendell Holmes said: "Legal, like natural divisions, however clear in their general outline, will be found on exact scrutiny to end in a penumbra or debatable land.” (Holmes, The Common Law [1963 ed], p 101.) This observation is in some respects applicable to the classification of . forms of relief as well, since, for example, mandamus is classified as legal relief, but is nevertheless indistinguishable from a decree of specific performance in its effect.
The conclusion is however justified that the issuance of injunctions or decrees of specific performance falls on the outer perimeter of this court’s jurisdiction. This is not because they are equitable in nature, but because the Court of Claims Act does not specifically refer to them, necessitating the position taken in Psaty (supra) that such relief must be incidental to a claim for money damages.
Turning now to the present claim, it is readily apparent that neither an injunction nor specific performance of a contract is sought. The primary, if not the sole object of the claim is to recover a sum of money equal to the amounts illegally levied upon by the State. The State possesses a proprietary interest in these funds. Accordingly, the Court of Claims has jurisdiction over the subject matter of this action.
Moreover, an article 78 proceeding is not the appropriate remedy for vindication of St. Paul’s rights under article 3-A of the Lien Law. Where jurisdiction over all parties can be obtained in a plenary action, such as one arising under section 77 of the Lien Law, mandamus does not lie. (Great Lakes Dredge & Dock Co. v Wagner, 46 AD2d 721.) Neither can relief in the nature of certiorari be obtained, since no determination of the tax liability of the trusts has ever been made. The Tax Commission’s assessment of Electorque’s tax liability is not strictly speaking at issue; it is the levies on trust assets which constitute the gravamen of the claim. Cases involving wrongful levies are eminently justiciable in this court, as indicated by IMFC Professional Servs. v State of New York (59 AD2d 1047) in which the State Tax Department levied upon and collected $5,265.50 in Medicaid funds due from the Monroe County Department of Social Services and payable to Walters Ambulance Service, claimant’s assignor. The tax war *157 rant issued following "the failure of Walters Ambulance to pay trust funds for employees’ income withholding tax”. Holding that claimant’s lien (a financing statement duly filed under Uniform Commercial Code, § 9-402) took priority over the tax lien, the Court of Claims granted summary judgment in claimant’s favor, which was unanimously affirmed by the Appellate Division, Fourth Department. (See, also, Hudson Val. Sand & Stone Co. v State of New York, 57 AD2d 344, treating a tax levy as a de facto appropriation.)
The question remains as to whether claimant is entitled to summary judgment. This depends upon whether the defenses raised by the State are valid, and whether issues of fact exist apart from the amount of damages which necessitate a plenary trial. (CPLR 3212; Andre v Pomeroy, 35 NY2d 361; Curry v Mackenzie, 239 NY 267.)
The State contends that: "To reach the result desired by St. Paul in this case would mean that Tax Department officials would never be able to levy on a contractor’s funds in the hands of an owner without determining the proportionate share of taxes due from a particular job * * * Surely such a result might be against public policy.” The foremost indicator of public policy in this regard is the Lien Law itself and authorities construing it. The thrust of Aquilino (supra), Harmon (supra), Onondaga (supra), and the authorities cited is that each construction project is a separate tax account which must be treated as such by the Tax Commission. The State’s position vis-á-vis each trust fund is as a beneficiary thereof, though admittedly possessing a priority in distribution of assets. The State cannot administer the tax laws as if article 3-A of the Lien Law had never been enacted, although the State’s affidavits demonstrate that this is precisely the course that was followed. The State cannot claim that it acted as a bona fide purchaser without notice, since the trust is statutory in nature and the State is presumed to know the law. Further, the affidavit of Grace Golad of the New York State Department of Taxation and Finance admits that at least $77,700.51 was received by the State directly from Board payments to Electorque. In view of the State’s failure to ascertain the tax liabilities of the individual trusts, its claim to such funds is without legal basis.
The court cannot, however, render summary judgment. Subdivision 1 of section 77 of the Lien Law requires that this action be maintained as a class action. Accordingly, a motion *158 pursuant to CPLR 902, certifying class action status, is a necessity. Of particular significance is the requirement that the order upon such a motion must describe the members of the class so that the court’s judgment may specifically designate the participants therein and the persons whose rights will be deemed to have been adjudicated. (CPLR 903, 905.) Claimant’s motion is therefore premature.
Accordingly, the State’s motion to dismiss is denied. Claimant’s cross motion for summary judgment is denied without prejudice to its renewal after class action status has been determined. Claimant’s application for permission to file a late claim has not been considered in view of the court’s determination that the claim was timely filed.

. Claimant’s notice of intention to file claim, notice of contingent claim and verified contingent claim will hereinafter be referred to as "notice of intention”.

. See Prosser, Torts [4th ed], § 1, which states: "A really satisfactory definition of a tort has yet to be found.” See, also, 1 Williston, Contracts, § 3.

. Pollock and Maitland, History of English Law, Lawyers Literary Club Edition, p 230.

. Mintzer v Windsor Lamp Mfg. Co., 175 Misc 551.

. The Court of Claims Act is not the only statutory source of this court’s jurisdiction. (See, e.g., Canal Law, § 120; New York State Defense Emergency Act, § 25; L 1951, ch 784, as amd; Public Lands Law, § 6; General Municipal Law, § 231; State Finance Law, § 43-a.)