OPINION OF THE COURT
Louis C. Benza, J.
This action is based on allegations that the autopsy performed on the body of Arthur Schwartz, claimant’s son and a State prison inmate at the time of his death, was performed in violation of Public Health Law § 4210-c, a statute protecting those who have religious objections to autopsy or dissection. Defendant contends that the autopsy was required by County *315 Law § 674 (5) and that, in any event, the State cannot be held responsible for the procedure because it was performed by county officials.
FACTUAL BACKGROUND
In 1983, Arthur Schwartz, an inmate in the State prison system, was diagnosed as suffering from AIDS (Acquired Immune Deficiency Syndrome). Approximately two years later, he became seriously ill with an AIDS-related infection and, on December 10, 1985, was transferred from Greene Correctional Facility to Greene County Memorial Hospital. He died in the hospital shortly after midnight on December 22.
Arthur Schwartz’ family was notified of his death at approximately 1:00 a.m. on the morning of December 22 by a telephone call from his treating physician, Dr. Rosenfield. Claimant Ruth Schwartz testified at trial that, after informing her of her son’s death, Dr. Rosenfield asked if he could perform an autopsy. She said that she told him "No, according to the Jewish religion you’re not supposed to perform an autopsy.”[2] Dr. Rosenfield called again at approximately 8:00 a.m. and asked a second time if an autopsy could be performed. Claimant testified that she responded, "I told you that hours before, that you cannot perform an autopsy to a Jewish person — and he was religious.” Mrs. Schwartz’ younger daughter, Patricia Frazier, corroborated her mother’s account of the telephone conversations when she testified at trial that she had been on the extension telephone during both conversations. Claimant further testified that shortly after 11:00 a.m. on December 22, Ronnie Gold, her older daughter, arrived at the family’s home and, in a telephone conversation with someone at the hospital, learned that an autopsy had already been performed on the decedent. When Ronnie informed her of that fact, claimant became "hysterical”. On cross-examination, claimant acknowledged that she never spoke directly with any State official regarding her objections to the autopsy.
As indicated, the Schwartz family is Jewish. Claimant testified that they attend an orthodox synagogue and observe many, although not all, of the traditions of the religion, and she stated that she kept a kosher household until her son’s death. The court allowed testimony about her son’s participation in religious activities, both as a youth and while in *316 prison, as well as some cross-examination on the question of the decedent’s religious observance, but, for the reasons discussed below, does not consider it relevant to the legal issues presented by this action (see, n 10, infra). The testimony of Rabbi Paul Silton confirmed that in the Jewish religion, any assault on the body of a deceased is considered desecration and is to be avoided in all but the most extraordinary circumstances (see also, Atkins v Medical Examiner of Westchester County, 100 Misc 2d 296; Weberman v Zugibe, 90 Misc 2d 254; Matter of Wilensky v Greco, 74 Misc 2d 512 [autopsies enjoined because of objections based on Jewish religious law]).
In an "inquisition” relating to the death of Arthur Schwartz, Greene County Coroner John J. McCurry wrote that he was notified of the death at approximately 9:30 a.m. on December 22 and arrived at the hospital around 10:00 a.m. to observe the body and to determine the time of death. At approximately 11:00 a.m., an autopsy was performed, at his direction, by Dr. Joseph Bellamy, the Greene County Coroner’s physician.[3] To the inquisition, McCurry attached "a letter to [him] dated, December 24, 1985, from William Gaunay, N.Y.S. Correctional Facility, Health System Evaluator”.[4] Other than its reference to the Gaunay letter, the inquisition does not mention the family’s objections to the autopsy or communications with State officials which preceded the autopsy.
James E. Lawrence, currently Director of Field Operations for the State Commission of Correction (SCOC), testified for defendant. He stated that in 1985 he was Director of the agency’s Medical Review Bureau, the staff serving the agency’s Medical Review Board (MRB). He identified, as a document kept in the regular course of business, an intra-agency memorandum dated December 24, 1985 and addressed to him from William Gaunay, a facility health system evaluator for SCOC. The memorandum reads, in relevant part, as follows:
"On Sunday 12/22/85, at 9:00 a.m. this writer received a call at home from Bob Corliss [identified as the on-duty officer for SCOC on that date] relating to the death of the above named inmate. Mr. Corliss stated that there was a question of autopsy in this case due to religious beliefs and the inmate had to be buried by sundown.
*317 "Mr. Corliss gave this writer a physician at Greene County Memorial Hospital to contact.
"I contacted Dr. Vosburg[h] [identified as the hospital’s Chief of Medicine], who stated the inmate had AIDS. When I questioned as to what the opportunistic infection was, he said 'he had the virus in his blood and spinal fluid’. When I mentioned CMV and toxoplasmosis he had no idea what I was talking about. I informed him that County Law required the county coroner to perform an autopsy on any inmate who died in custody. He accepted this, and I stated that if the coroner had questions to call me at home. I did not receive any further calls. I made Commissioner McNulty aware of the situation and he agreed with my approval [here, the word 'approval’ has been stricken and the word 'approach’ written in].
"On 12/23/85, I received a call from Deputy Frees of Greene Correctional Facility and he appreciated our intervention. He stated the coroner wanted a letter of authorization for the autopsy. I explained to Deputy Frees that this is not necessary because the law defines the coroner’s responsibilities.
"I agreed to send a copy of the law to the coroner.”
In the December 24 letter referred to above, Gaunay wrote the following to Coroner McCurry:
"On 12/23/85, this writer received a call from Deputy Frees of Greene Correctional Facility of your request for an authorization of the autopsy of Arthur Schwartz, who died in Greene County Memorial Hospital on 12/22/85.
"The Commission does not have to authorize autopsy procedures since it is required by County Law, Article 17-A, 674 (5).
"I have attached a copy of this law for your information.”
Mr. Gaunay was not called to testify by the State, although Mr. Lawrence indicated that he is still employed by SCOC and works in Albany. Nor were Bob Corliss, Deputy Superintendent Frees, Commissioner McNulty or Dr. Rosenfield called to testify, although their availability is not known. Coroner McCurry and Dr. Vosburgh are now deceased. These documents, therefore, together with the testimony of decedent’s mother and sister, provide all that can be known about the events of December 22, 1985.[5]
*318 RELEVANT LAW
Unless authorized by law or performed pursuant to permission given by the deceased, the autopsy or dissection of a human body is illegal and any person who "makes, or causes or procures to be made” any dissection is guilty of a misdemeanor (Public Health Law § 4210-a). Persons responsible for an unauthorized autopsy being performed may also be liable for money damages in a civil action brought by the decedent’s next of kin (Brown v Broome County, 8 NY2d 330; Torres v State of New York, 34 Misc 2d 488; see also, Rotondo v Reeves, 153 Misc 2d 769, 772-773). "[A]n action to recover damages for the performance of an unauthorized autopsy is designed to compensate family members for the emotional and mental suffering occasioned by an improper dissection of a decedent’s body” (Bambrick v Booth Mem. Med. Ctr., 190 AD2d 646, 647 [citations omitted]), and permitting civil actions based on violation of the relevant statute is seen as necessary to prevent the statute from being "rendered meaningless and * * * disregarded with impunity” (supra, at 648). Defendant’s motion, on which decision was reserved, to dismiss the instant claim because it is based on an intentional tort and was not filed within one year of the date on which it accrued (Court of Claims Act § 10 [3-b]) is therefore denied. Inasmuch as a timely notice of intention was served and filed, claimant had two years in which to bring a cause of action based on violation of a statutory right (Court of Claims Act § 10 [4]; see, St. Paul Fire & Mar. Ins. Co. v State of New York, 99 Misc 2d 140).
Defendant contends that the autopsy of the body of Arthur Schwartz was not only authorized but required by County Law § 674 (5). In 1985 this provision stated, in pertinent part, as follows: "The coroner, coroner’s physician or medical examiner shall promptly prepare an autopsy report * * * with respect to any death occurring to an inmate in a correctional facility * * * within his county or while not occurring in a correctional facility the cause of death is related to the incarceration or detention of a person in a correctional facility within his county”. In addition, section 677 (6) of the County Law required that copies of any autopsy report, along with all other information relating to an inmate death, be provided "promptly” both to Department of Correctional Services *319 (DOCS) and to the MRB.[6] Then, as now, section 16 of the Correction Law makes the State, rather than the counties, responsible for paying the costs of autopsies performed on State inmates.
Section 4210-c of the Public Health Law, which was enacted in 1983 (L 1983, ch 841, § 1), requires that certain specific steps be taken when (1) a surviving relative or friend raises objections that a dissection or autopsy "is contrary to the religious belief of the decedent” or (2) there is "otherwise reason to believe” that such a procedure would be contrary to the decedent’s religious beliefs. This statute applies "[notwithstanding any other provision of law” (Public Health Law § 4210-c [1]).
The statute does not necessarily prevent an autopsy from occurring, but it places specific limits and restrictions on the performance of such a procedure. An immediate autopsy may occur, despite religious objections, if there is a "compelling public necessity” requiring it, but the term "compelling public necessity” is strictly limited to only three specific situations, none of which were present here. Where religious objections have been raised and there is no compelling public necessity, notice must be given to the next of kin or friend and there must be a delay of 48 hours before an autopsy is performed, so that the objecting party may institute legal proceedings "to determine the propriety of such dissection or autopsy” (Public Health Law § 4210-c [4]). This mandatory waiting period may be dispensed with only by court order (ibid.).
DOCS and its role in the custody, control and care of State prison inmates needs no detailed discussion (see generally, Correction Law arts 4, 6). SCOC is an oversight and rule-making agency that is separate from DOCS and has jurisdiction over both State and local correctional facilities (see, Correction Law art 3). Within this agency, the MRB is charged with investigating "the cause and circumstances surrounding the death of any inmate of a correctional facility” (Correction Law § 47 [1] [a]). When necessary, SCOC has commenced judicial proceedings to enforce the MRB’s right to obtain information needed for its investigations (see, Matter of *320 State Commn. of Correction v Nassau County Med. Ctr., 137 AD2d 127, lv denied 72 NY2d 810; Matter of Kaminsky, 134 Misc 2d 218).
In addition to the autopsy reports which must be provided to the MRB by County Coroners (County Law § 677 [6]), the administrator of each correctional facility (State or local) is also required to provide the MRB with an autopsy report in connection with each inmate death (Correction Law § 47 [2]). The MRB is also empowered to order that an autopsy, which may be a second autopsy, be performed on the body of a deceased inmate (Correction Law § 47 [1] [c]).[7] According to Mr. Lawrence, autopsies are an "indispensable tool” in the work of the MRB because of their role in fully determining the causes of inmate deaths and the discovery of diseases affecting prison inmates and staff members. He referred to the discovery of AIDS and, later, tuberculosis within the prison system as examples of discoveries that have been made through autopsy results.[8]
Lawrence testified that SCOC was aware of and considered itself bound by the provisions of Public Health Law § 4210-c, but he had been instructed merely to refer the matter to counsel’s office "for further disposition” if he personally became aware that the statute was being invoked. In addition, there was no procedure in place to guide other SCOC employees, such as Mr. Corliss or Mr. Gaunay, should they become aware that religious objections were being raised in connection with an inmate autopsy. Lawrence also acknowledged, and the events of this case illustrate, that SCOC employees were directed to respond to inquiries from Coroners or other local officials about whether an autopsy was necessary in connection with an inmate death by informing them that "County Law § 674 requires such a procedure to be per *321 formed.” When asked how SCOC was prepared to give effect to the Public Health Law provision limiting autopsies in certain situations, Lawrence stated that the occasion to do so would "never arise” because autopsies are performed by Coroners or Medical Examiners, not State officials.[9]
DISCUSSION
Had no religious objections been raised, it is undisputed that County Law § 674 (5) authorized the Coroner to perform an autopsy on the body of Arthur Schwartz and, indeed, required him to do so if he concluded (as he must have done in this instance) that the inmate’s death was related to his incarceration. This authority, however, is limited by the provisions of Public Health Law § 4210-c which, by its express, unequivocal terms, applies to autopsies performed under the authority of "any other” statute.
The requirements of section 4210-c were violated in connection with the autopsy performed on Arthur Schwartz. There was no "compelling public necessity” as that term is defined in the statute, and, despite the clearly stated objections of Mrs. Schwartz,[10] she was not notified that an autopsy was going to be performed and given 48 hours in which to institute legal proceedings; nor was a court order obtained to waive that mandated period of delay.
Defendant asserts that even if Public Health Law § 4210-c was violated, the State cannot be held responsible because the autopsy was performed by county officials, not anyone acting on behalf of the State. The question of whether liability can fall on a party that does not actually perform the unlawful autopsy has been addressed and decided in Rotholz v City of New York (151 Misc 2d 613), which appears to be the only published decision dealing with section 4210-c of the Public Health Law.
In that case, the family’s religious objections to the procedure were made known to physicians at Lenox Hill Hospital *322 but were not made known to the Office of Chief Medical Examiner of the City of New York, either when that office was notified of the death or, later, when the body was transferred to the Medical Examiner. The Medical Examiner’s office, which performed the autopsy, was absolved of responsibility because it had no notice of the religious objection, but the hospital’s effort to have the case against it dismissed was denied. Relying on Public Health Law § 4210-a, which imposes criminal penalties on anyone who "makes, or causes or procures to be made, any dissection of the body”, the court held that the hospital "by failing to inform the Medical Examiner’s office of plaintiff’s objection to performance of an autopsy caused or procured an unauthorized autopsy on the body of [the decedent]” (supra, at 618). The relevant question here, therefore, is whether State officials "caused” this autopsy to be performed in violation of the Public Health Law or, in any other fashion, are legally responsible for it being performed.
Under common law, the body of a deceased person may not be abandoned or treated disrespectfully by the person or entity responsible for it — traditionally the person "under whose roof’ the death took place — until it has been claimed by surviving family members or appropriate public officials or, if unclaimed, until it has been given a decent burial or cremation (Finley v Atlantic Transp. Co., 220 NY 249, 255; Matter of Kraemer, 183 Misc 101, 103; 25A CJS, Dead Bodies, §§ 3, 5; 18 NY Jur 2d, Cemeteries and Dead Bodies, § 72). In New York and in some other jurisdictions, this duty is statutory. Public Health Law § 4200 (1) directs that every body of a deceased be decently buried or cremated within a reasonable time after death, and it has been held that the statute creates a duty which, in certain circumstances, may fall even upon those who are strangers to the decedent (Cercelli v Wein, 60 Misc 2d 345 [hotel owner held responsible]). This statutory duty applies with equal force to bodies that have been autopsied, once the "lawful purposes of such dissection have been accomplished” (Public Health Law § 4215 [1]).
Arthur Schwartz was in the custody and control of DOCS prior to his death, and DOCS became responsible for his body at the time of death. This responsibility continued until the body was claimed by the members of his family. If there had been no family member able or willing to claim the inmate’s body, DOCS would have had a further duty to provide a decent burial or cremation, a duty evidenced by the grave *323 yards attached to the State’s correctional institutions (see, e.g., Correction Law § 664).
The duty owed to the body of a deceased is conditioned only where "a right to dissect it is expressly conferred by law” (Public Health Law § 4200 [1]). Thus, the person or entity responsible for a dead body must permit an autopsy to be performed when one is required by law. In the typical case, therefore, DOCS is not required to release the body of a deceased inmate to family members or provide it with appropriate burial until after a Coroner or Medical Examiner has performed the autopsy expressly authorized by County Law § 674 (5). If, in a particular instance, the MRB decided to have a second autopsy carried out on an inmate’s body, pursuant to Correction Law § 47 (1) (c), DOCS would be required to permit that procedure as well.
This was not the "typical” case, however. Here, religious objections to an autopsy were raised in a timely fashion by the persons authorized to make such objections and, as a result, Public Health Law § 4210-c became applicable. Once the threshold for invoking this statute has been met, as it was here, the legal authority or requirement for an autopsy contained in County Law § 674 (5), in Correction Law § 47 (1) (c), or in "any other” statute is stayed unless and until the procedures called for in the Public Health Law provision have been carried out. Not only was the autopsy performed on the body of Arthur Schwartz not expressly authorized by law, it was expressly prohibited by law.
DOCS, which was legally responsible for the inmate’s body during this period between death and its conveyance to family members, was fully aware that religious objections had been raised by members of the decedent’s immediate family and, thus, that Public Health Law § 4210-c stayed, at least temporarily, any other statute authorizing an autopsy to be performed. Under these circumstances, DOCS had a duty not only to refuse permission for the autopsy but, if the situation called for it, to take affirmative steps to stop any dissection of the body.
In the instant case, however, the Coroner’s uncertainty and reluctance to perform the autopsy are readily apparent. When apprised of the family’s objections, he arranged for DOCS to be contacted and informed of these objections, and he requested written "authorization” from the State if the autopsy was to be performed. Rather than carrying out its duty to *324 forbid an autopsy under these circumstances, DOCS turned the Coroner’s inquiry over to another State agency, SCOC, and left it to them to respond. The response given by these State officials was, for all practical purposes, a direction to the Coroner that he must perform the autopsy and simply ignore the family’s objections to the procedure.
None of the State officials who were contacted — Deputy Superintendent Frees, Bob Corliss, or William Gaunay — suggested that the Coroner’s concern was a matter which he, and he alone, had the responsibility of resolving. Instead, he was told that he was "required” by law to perform the autopsy and encouraged to speak directly with the SCOC representative if he had any "questions” about this requirement, implying that any such questions could and would be answered by that authority.[11] Although the reason for the inquiry was the fact that religious objections had been raised by decedent’s family, in their response, the State officials referred only to the duty to perform an autopsy found in the County Law. They were silent about the equally relevant — in fact, controlling — requirements of Public Health Law § 4210-c.
Under these circumstances, the response given to the Coroner was tantamount to an order that he ignore the family’s objections and proceed with the autopsy. Because this order or direction came from the State agency responsible for the decedent’s body (DOCS) and the agency responsible for investigating all inmate deaths (SCOC), and because the Coroner owed a statutory duty to provide autopsy reports to both agencies, it carried the authority of a legal mandate. The court has no difficulty in finding that without such authoritative direction from the State, the Coroner would not have performed an autopsy on the body of Arthur Schwartz.
Accordingly, the court finds that the autopsy performed on the body of Arthur Schwartz was unlawful in that it was performed in violation of Public Health Law § 4210-c. In view of its responsibility for the body, the State, by failing to *325 prohibit the procedure and by not taking the necessary preventive steps, caused the autopsy to be performed and, in fact, directed the Coroner to carry out the procedure despite the family’s objections.
DAMAGES
Claimant testified that she became "hysterical” when she learned that, despite her refusal, an autopsy had been performed on her son’s body. She also testified that she continues on a daily basis to think of her son and the things that were done to his body. There is ample evidence to establish that, despite being incarcerated, Arthur Schwartz remained close to his family and maintained regular contact with his parents and sisters. The family’s deep and sincere distress about these events was observed and is credited by the court.
In connection with related actions brought in Supreme Court and in Federal District Court, counsel stipulated that claimant has received, or will receive, a total of $3,500. In light of this partial recovery from other sources, the court directs the Chief Clerk to enter judgment for claimant in the amount of $7,500.[12]

. Unless otherwise indicated, quotations of statements made by witnesses have been taken from the court’s notes or the tape of the trial.

. Dr. Bellamy determined the cause of death to be "[b]ronchopneumonia due to extensive brain necrosis due to toxoplasmosis of brain associated with [AIDS]”.

. Gaunay’s letter was introduced as exhibit 8.

. An affidavit executed by Mr. McCurry in 1988 was also introduced. Its *318 contents are admissible only insofar as he states that he "caused an autopsy to be done” on the inmate’s body.

. In 1987, at the urging of the SCOC, both of these statutes were amended to delete any limitation on the duty to perform autopsies on inmates dying outside a correctional facility, and County Law § 671 (1) (b) was added to require Coroners and Medical Examiners to conduct an inquiry into all inmate deaths (see, Mem of State Commn on Corrections, 1987 McKinney’s Session Laws of NY, at 2490).

. James Lawrence testified that when the MRB invokes this power, it takes physical possession of the body — or arranges for it to be retained by its present custodian — and hires its own independent pathologist to carry out the procedure. Claimant does not contend that the MRB exercised its authority under Correction Law § 47 (1) (c) to order an autopsy on the body of Arthur Schwartz, and there is no evidence suggesting that it did so.

. Illustrating the importance placed on obtaining autopsy results, Lawrence testified that even in 1985 SCOC considered County Law § 674 (5) to require an autopsy in all inmate deaths, without exception, although the statute contained an express exception. According to Lawrence, the 1987 amendment removing this exception did not change "the requirement of the law” but, rather, simply "clarified” the Legislature’s original intention that an autopsy be performed "whenever and wherever” an inmate dies.

. The court understands this response to relate only to autopsies performed pursuant to the County Law, not those that might be ordered by the MRB under the authority of Correction Law § 47 (1) (c).

. If there were any doubt about the authenticity of the family’s objections, the objecting party could have been required to submit an affidavit setting forth the relevant particulars (Public Health Law § 4210-c [2] [b], [c]). Because this step was not taken, the authority of Mrs. Schwartz to speak on her son’s behalf and the true status of decedent’s religious beliefs at the time of his death become irrelevant.

. This is no suggestion that Mr. Gaunay or the others who directly responded to the Coroner’s inquiry went beyond the scope of their authority and acted in a manner not permitted or authorized by their agency. The DOCS representative subsequently thanked Gaunay for his "intervention”, and when Gaunay recounted the events to one of the SCOC Commissioners, his "approach/approval” was endorsed. Mr. Lawrence also testified that in his view the actions taken were appropriate and, as noted above, they were consistent with the directions given to SCOC employees for responding to such inquiries.

. It is the court’s intention that claimant recover a total of $11,000.