OPINION OF THE COURT
Diane L. Fitzpatrick, J.
*905 This claim is for damages as a result of an alleged unauthorized autopsy on claimant’s father, Wilfred W Westerfeld. There are a few factual discrepancies in the testimony and evidence presented.
Dr. Westerfeld taught for more than 30 years and was chairman of the Bio-Chemistry Department at SUNY Upstate Medical University before he retired in 1978. His wife predeceased him 10 years earlier on the same day, September 10, 1992. They had five children: claimant, the eldest, who lives in Silver Spring, Maryland; Margaret Davies, who lives in the Syracuse area; William Westerfeld who lives in Rochester; Noel Spaid who lives in Del Mar, California; and John Westerfeld who lives in Brunswick, Maryland. Approximately six years before his death, Dr. Westerfeld had a stroke, and his daughter, Margaret, moved into his home on Hunt Lane in Fayetteville, to assist him with his daily needs. She testified that she did laundry, cooked and shopped for him, and she had his power of attorney, so she paid the bills as well.
In the few weeks before he died, Dr. Westerfeld suffered another stroke and was taken to the hospital. Claimant spent approximately three weeks visiting with her father before his death. She had returned to Maryland for her employment when her father passed away on September 10, 2002, at 8:50 p.m.
Margaret Davies testified that on that day she was on the telephone with her sister, Noel, when the operator broke in and asked if she would free the line so an emergency call from Upstate could be received. Before that call came in, a friend of Margaret’s, who had been contacted by the hospital, called to inform Margaret of her father’s passing and to offer her a ride to the hospital. Margaret’s friend and her husband took Margaret to the hospital later that night.
Margaret went to her father’s room and spoke with a nurse there. A doctor carrying a clipboard came in, who was later identified as Alex Perez, M.D. Margaret recalled that he asked her for permission to do an autopsy on her father for educational purposes. Dr. Perez testified[2] that he was paged and sent to the room because the family requested an autopsy. Dr. Perez felt, from what Margaret told him, that Dr. Westerfeld was an educator and would have wanted an educational autopsy. Margaret signed an authorization for postmortem *906 examination,[3] for educational purposes, without limitations, on that evening and Dr. Perez witnessed it. Margaret’s testimony was that she had no objection to an autopsy under these circumstances, because her father was an educator and this would be in keeping with his life’s work. Next to her signature on the consent form Margaret wrote, “POA,” to reflect that she had his power of attorney during the decedent’s last several years.
Margaret called claimant and Noel when she returned home later that night to tell them about their father’s passing. She or claimant called their brothers the next day. On the night of their father’s death, there was no conversation among the sisters regarding the autopsy.
The next morning, Margaret received a call from Donald Jaeger, technical director of autopsy services for SUNY Upstate Medical University asking for the names and telephone numbers of her siblings so he could get their consent for the autopsy as well. He asked her to let them all know that he would be calling and if there was any objection she should contact him.
On September 11, 2002, claimant went into work to prepare for the trip to Syracuse and her father’s funeral. While there, she received a call from her husband, Clarence “Ray” Rakow, who informed her that she received a faxed consent form at their home for an autopsy to be performed on her father. Claimant said she was surprised by this because an autopsy had never been discussed. Clarence testified he told his wife that Margaret had called to say that Donald Jaeger from University Hospital would be calling for claimant and sending her a consent form for the autopsy. Clarence testified at trial that after speaking with Mr. Jaeger, he told claimant that the consent form must be signed in order for the autopsy to be completed.
Claimant returned home to pack and, as she was leaving, her husband handed her the consent form and fax cover sheet Mr. Jaeger had sent. She took the papers, said that she needed to think about it and would deal with them later. The consent form was a copy of the one Margaret signed so it contained Margaret’s signature.
Claimant testified that her husband had told her Margaret thought everyone should consent, and if there was an objection, the person should contact Margaret. Clarence did not testify to that. Claimant said she knew she didn’t want her father to have *907 an autopsy, but she was hesitant in approaching Margaret about it because she thought Margaret was strongly in favor of it. She arrived at Hunt Lane between 4:00 p.m. and 6:00 p.m. that evening. There was no discussion of the autopsy that night and claimant did nothing to contact Mr. Jaeger.
The next morning, claimant and Margaret went to make funeral arrangements at Fairchild & Meech Funeral Home. They were there about IV2 hours, then they ordered flowers and did some grocery shopping before returning to Hunt Lane. After lunch, at approximately 3:00 p.m. or 3:30 p.m., claimant finally told Margaret that she didn’t want an autopsy performed. She couldn’t explain why, it was visceral. Margaret said that was good enough for her and claimant should call Mr. Jaeger to advise him. Claimant testified that she called and received Mr. Jaeger’s voice mail. She left a message in which she claims she stated twice that she opposed the autopsy of her father.
The calling hours were scheduled for Sunday, September 15, 2002. Claimant was standing by the open casket and felt that her father’s face didn’t look right. She smoothed back his hair, as she had done while caring for him after his stroke, and felt something rough on the back of his head. She retrieved Margaret and had her touch the rough area too. They both thought they were feeling stitches and were shocked. Claimant then spoke with the funeral director, Mr. Meech, who confirmed their suspicion that an autopsy had been performed. He repeated this to Margaret and Noel. Later, on the day of the funeral or the next day, Noel called the hospital and was told that four out of five siblings consented to the autopsy and that was sufficient. Noel, an attorney, told claimant that she may have a lawsuit against the hospital for performing an unauthorized autopsy.
Claimant testified that as a result of her father undergoing an autopsy, she has trouble falling asleep and staying asleep at night. She cries at inappropriate times during the day for no apparent reason. When she recalls spending time with her father, the vision of him on the autopsy table “laid open” comes unbidden to her mind. She was extremely upset to think that her wishes were ignored.
The State called Donald Jaeger as their witness. He described the procedure used at Upstate for obtaining consent for an autopsy. It is usually the treating physician who speaks with the *908 family about a hospital autopsy.[4] After a death in the hospital, Mr. Jaeger is paged or notified and obtains the file from the admitting office. Mr. Jaeger carries a pager and the number is provided on his office voice mail message.
In this case, Mr. Jaeger recalled that he was paged by the admitting office on September 11, 2002, and advised of Dr. Westerfeld’s death, and that the family was requesting an autopsy. Mr. Jaeger went to the admitting office and obtained Dr. Westerfeld’s file and the consent form signed by Margaret so he could arrange the autopsy. He learned that Margaret had other siblings, so he contacted her that morning to get their names and telephone numbers, and he suggested that she let' her siblings know he would be contacting them and determine whether or not they would have any objections to the autopsy. He said he was trained to do this as a funeral director. His intention was to avoid any turmoil for the family. He told Margaret that if there were any objections she should let him know. The fax form he sent to each sibling gave his telephone number and requested a call if there were any questions. No one called him with questions. He said he would not have had the autopsy performed if he had received any objections.
Mr. Jaeger’s file was submitted[5] into evidence. The file contained the fax cover sheets he sent to the Westerfeld children, the returned consent forms, and his personal notations among other items. His notes contain a list of Margaret’s siblings with phone and fax numbers. Noel and William had returned the signed consent forms and he noted next to John’s name that he received verbal permission from him on September 11, 2002. Next to claimant’s information, he noted that he received verbal permission from her on September 12, 2002. He could not recall when he made the notation. He recalled getting a message from claimant that day, after the autopsy was completed, saying she had no objection to the autopsy. He never spoke directly to claimant.
Mr. Jaeger had the hospital compile his long distance telephone records for September 10 through 12, 2002, which show the calls he made to the siblings. It shows that he called claimant’s home number on two occasions the morning of *909 September 12. Mr. Rakow testified that he was home that whole day and no one called. Mr. Jaeger said he could not recall if an answering machine had picked up his calls, nor could he recall how many times the phone rang.
That same morning, Mr. Jaeger made arrangements for Dr. Westerfeld’s body to be transported to the medical examiner’s office by a funeral director who contracts with the hospital to handle the transportation. The funeral home handling the services for the deceased obtains the body from the medical examiner’s office after the autopsy. According to the records, the autopsy was performed at approximately 11:00 a.m. on September 12, and it would have been completed by approximately 12:30 p.m. Claimant’s call to Mr. Jaeger was made between 3:30 p.m. and 4:30 p.m. that afternoon, after the autopsy was completed.
The claimant argues that her failure to return the consent form should have been interpreted as an objection to the autopsy, and that pursuant to the language on the consent form,[6] her consent was required before an autopsy could be performed in the 48 hours after death; she also argues that the time frame within which the autopsy was performed failed to comply with the Public Health Law requirements, and that “next of kin” in the statute refers to all of the persons who have the same degree of affinity. In other words, the consent to perform the autopsy had to be signed by all five children. Claimant seeks damages for defendant’s breach of the statute (Public Health Law § 4214 [1]) and for intentional infliction of emotional distress.
Defendant argues, in opposition, that public policy bars any action for intentional infliction of emotional distress against the State, and the proof fails to show that the State otherwise breached any duty owing to claimant. It is the State’s position that once the consent of Margaret Davies, the offspring who resided and cared for the decedent, was obtained, no other consent was required. Next of kin means one next of kin and not all of the next of kin in the State’s view.
Legal Discussion
The right to autopsy a deceased exists only by statute or permission of the decedent (Public Health Law § 4210). An *910 autopsy performed without legal authority or proper permission prior to November 1, 2006 was a misdemeanor (Public Health Law former § 4210-a [effective November 1, 2006, unauthorized dissection of the body of a human being is a class E felony]).
A hospital may order an autopsy as long as there is compliance with Public Health Law § 4214 (1), which provides:
“The director or person having lawful control and management of any hospital in which a patient has died may order the performance of an autopsy upon the body of such deceased person, after first giving notice of the death to the next of kin of such person, unless the body is claimed or objection is made to such autopsy by the next of kin within forty-eight hours after death, or within twenty-four hours after such notice of death. In no case shall an autopsy or dissection be performed upon any body within forty-eight hours after death, unless a written consent or directive therefor has been received from the person or persons legally entitled to consent to or order such autopsy or dissection. Except as required by law, no dissection or autopsy shall be performed on the body of any person who is carrying an identification card on his person indicating his opposition to such dissection or autopsy.”
This case turns upon an interpretation of this statutory language; specifically, who must provide written consent. It is without dispute that this autopsy was performed within 48 hours of Dr. Westerfeld’s death. The critical question is whether Margaret’s written consent was sufficient for purposes of the statute or was the consent of all five children required?
As with any statutory construction case, the primary consideration is to “ascertain and give effect to the intention of the Legislature.” (McKinney’s Cons Laws of NY, Book 1, Statutes § 92 [a]; Riley v County of Broome, 95 NY2d 455, 463 [2000].) “[T]he words of the statute are the best evidence of the Legislature’s intent” and the unambiguous language should be construed to give effect to its plain meaning (id.; Matter of DaimlerChrysler Corp. v Spitzer, 7 NY3d 653, 660 [2006]).
The initial inquiry is who is legally entitled to consent to the autopsy. Public Health Law § 4210 provides:
“The right to dissect the body of a deceased person exists in the following cases: . . .
“3. Whenever and so far as the husband, wife or *911 next of kin of the deceased, being charged by law with the duty of burial, (a) may authorize dissection for the sole purpose of ascertaining the cause of death, or (b) may authorize dissection for any other purpose by written instrument which shall specify the purpose and extent of the dissection so authorized, and when a dissection is so authorized pursuant to this subdivision the person authorizing the dissection also may designate a physician licensed in any state or country to observe such dissection.”
The statute gives the right of consent to the husband, wife, or next of kin being charged by law with the duty of burial. The dependent clause, being charged by law with the duty of burial, restricts the class of persons required to consent. Who, then, has the duty of burial? Public Health Law § 4200 (1) clearly establishes the duty but imposes it on no specified individual or group of individuals. To find upon whom the duty is imposed, we must turn to case law.
The case law clearly establishes the hierarchal right to possession and the corollary duty of proper burial of the decedent, first in the spouse and thereafter the next of kin (Darcy v Presbyterian Hosp. in City of N.Y., 202 NY 259 [1911]; Gostkowski v Roman Catholic Church, 262 NY 320 [1933]; Finley v Atlantic Transp. Co., Ltd., 220 NY 249 [1917]; Correa v Maimonides Med. Ctr., 165 Misc 2d 614 [1995]; Rotondo v Reeves, 153 Misc 2d 769 [1992], revd in part on other grounds 192 AD2d 1086 [1993]; Lott v State of New York, 32 Misc 2d 296 [1962]). In the absence of a spouse, the next of kin bear both the burden and the right to the uninterfered burial of their deceased (Patterson v Patterson, 59 NY 574 [1875]). Case law, at least as uncovered by this court, does not define “next of kin.” (See Matter of Bernstein, 185 Misc 2d 493 [2000]; Whack v St. Mary’s Hosp. of Brooklyn, 2003 NY Slip Op 50026[U] [2003].) Next of kin is defined in EPTL 2-1.1 as distributees or the person(s) entitled to take or share in the property of the decedent under statutes governing descent and distribution (EPTL 2-1.1, 1-2.5). Those persons under the EPTL are children first, followed by other descendants of common ancestry. Adi things being equal then, the next of kin with the duty and the right of burial are a decedent’s children with no one child bearing a greater obligation or right. This, too, would be consistent with defendant’s *912 own policies.[7] Defendant’s administrative policy manual relating to autopsies (policy No. A-ll) reflects that permission must be granted by the “next of kin,” which the policy on informed consent (policy No. C-07) reflects are, in order of contact, the health care proxy, the spouse, or if none, the “[cjhildren (18 years of age or older).” (Exhibits F, G.) No preference is given for one child over another.
Yet, to give purpose to the qualifying language of the statute, authorizing who may consent to an autopsy (Public Health Law § 4210 [3]), case law seems to suggest, in some circumstances, the duty of burial may fall to one other than the spouse or next of kin closest in line of descent. At common law a duty is recognized in the one under “whose roof’ the decedent dies, to care for the body until it may be properly buried (see Finley, 220 NY at 255; Schwartz v State of New York, 162 Misc 2d 313, 322 [1994]). This duty may evolve into the duty to provide a proper burial and may even fall to one unrelated to the decedent (see e.g. Cercelli v Wein, 60 Misc 2d 345 [1969] [hotel owner had duty of burial]; Schwartz v State of New York, 162 Misc 2d 313, 322-323 [1994] [if inmate had no family willing to claim his body, Department of Correctional Services, in whose custody decedent died, would have had duty of burial]). This rule of law led one court to find one child had the duty to bury the parent who died without a spouse over another child of common affinity. In McKibben v McKibben (203 Misc 310 [1952]), a father died leaving seven children and no spouse. Prior to his death, the father resided with one child, Madeline. Madeline arranged for and paid the cost to bury her father, deciding with her other siblings (not the defendant brother) to use a small insurance policy to cover another debt. Madeline then sought reimbursement of a proportionate share of the burial costs from one estranged brother. The McKibben court held that based upon the common-law duty of the person under whose roof a person dies to care for the body for burial, the court found the obligation for burial fell to Madeline, with whom the father was living at the time of his death. As the duty of burial fell to her, so did the obligation for the cost. Weighing into the court’s decision was Madeline’s failure to consult or even notify the estranged brother of the arrangements, despite her argument that she didn’t know how to reach him (see also Hassard v Lehane, 143 App Div 424 [1911] [mother with whom decedent resided had duty of burial]; compare Stiles v Stiles, 113 Misc 576 [1920] *913 [primary right/duty to bury with spouse over children, but in some circumstances, such an inflexible rule might result in great harshness]; Buchanan v Buchanan, 28 Misc 261 [1899] [where widow, although the one bearing the duty of burial under the law, did not have the right to decedent’s body as against the decedent’s brother, where the widow had been separated from the decedent prior to his death and had commenced an action for separation from the decedent]).
Yet, in those cases where someone other than the spouse was found to have the duty and right of burial or in McKibben where one child had the duty of burial over another child, the circumstances reflect physical possession of the body at the time of death, estrangement or other unusual factors. In this case, although Margaret stood out as the person with whom Dr. Westerfeld resided prior to his hospitalization and who managed his affairs as his power of attorney, his other children were not estranged, unidentified, or unavailable for consent. It seems to this court, under these circumstances, that the duty to provide Dr. Westerfeld with a proper burial belonged to the five children as an equal group. That one or more children may have taken the lead does not negate the legal duty and right of the others.
This decision comports with the well-guarded right of a decedent’s family to the undisturbed possession of their loved one’s body in the condition it was at death; a right that has been protected through the private right of action even in early common law (see Darcy v Presbyterian Hosp. in City of N.Y., 202 NY 259 [1911]; Finley, 220 NY at 257-258; Buchanan, 28 Misc at 261; Massaro v O’Shea Funeral Home, 292 AD2d 349 [2002]). The statutory limitation on autopsies in article 42 of the Public Health Law “reflects these concerns for respecting the corporeal remains of decedents and protecting the feelings of family members by strictly limiting the circumstances under which autopsies may be performed.” (Bambrick v Booth Mem. Med. Ctr., 190 AD2d 646, 647 [1993]; see also Public Health Law art 42.) The statutes give the next of kin, or even a friend, the right to object to the autopsy, particularly where the objection is based upon the decedent’s religious beliefs (see Public Health Law §§ 4210-c, 4214 [1]). The burden to obtain the written consents of all of the nearest next of kin is not, based upon the statute, unduly onerous, where the burden is cast for only the initial 48 hours after death. For in this case, if defendant had waited an additional 10 hours, as no established urgency was identified, and if, as Mr. Jaeger testified, no objections were received, no li *914 ability would be found. Placing this obligation upon the hospital is consistent with the language of the statute and case law, and is reflective of Mr. Jaeger’s awareness of the importance, if not the legal requirement, to obtain the consent of all of the children. Accordingly, the court finds that within those initial 48 hours after Dr. Westerfeld’s death, the written consent of all five children was required to legally perform the autopsy (see Bambrick, 190 AD2d at 647). The failure to obtain the necessary written consents establishes this claim for a wrongful autopsy.
Claimant testified to the emotional distress she suffered as a result of the unauthorized autopsy, and although the court did find the continued upset she described contrived, her initial distress was likely sincere. Even without an accompanying established physical injury, emotional harm is recoverable where it is due to the negligent mishandling of the body of a close relative (see Johnson v State of New York, 37 NY2d 378, 382 [1975]; Correa, 165 Misc 2d at 619). Accordingly, claimant is awarded the sum of $3,000. Claimant’s request for punitive damages is denied as punitive damages may not be assessed against the State (Harvey v State of New York, 281 AD2d 846, 849 [2001]).
All motions not previously addressed are hereby denied.
To the extent claimant has paid a filing fee, it may be recovered pursuant to Court of Claims Act § 11-a (2).

. Dr. Perez’s testimony was taken at a deposition and entered into evidence as exhibit L.

. This is contained in exhibit 4.

. A hospital autopsy can occur by request of the family or the request of the clinician, if, for instance, the cause of death is not clear. A medical examiner autopsy must occur under certain circumstances and consent is not necessarily required (Public Health Law §§ 4210, 4214; exhibit F).

. Exhibit 4.

. At the bottom of the consent form it provides: “Pathologist may not proceed with examination unless proper signature(s) have been obtained and until permit has been checked to be sure that it is complete and satisfactory.” (See exhibit 3.)

. See exhibits F, G.