OPINION OF THE COURT
Philip J. Patti, J.
On July 22, 1995, Dr. Natasha Muckova was in the midst of the first month of her residency in anatomical and clinical pathology at Strong Memorial Hospital (hereinafter referred to as TJRMC) and was one of the pathologists on call on that date. She had graduated from the University of Rochester Medical School in May 1995 and had just begun to embark on her desired career path.
Prior to starting in the residency program, Dr. Muckova was required to take a PPD[1] test as part of her pre-employment physical. The results of this May 30, 1995 test were negative for tuberculosis (TB). Dr. Muckova started the residency program at URMC on July 1, 2005. The first days of the program were devoted to orientation conducted by the heads of the various *429 departments that make up the Pathology Department. Over the course of her five-year residency, Dr. Muckova would be required to rotate through various subspecialties in the field of pathology. Her first assignment was a three-month rotation through the autopsy program. Dr. Muckova testified that she did not participate in any autopsies; rather, in the second week she observed two autopsies on adults and either one or two pediatric autopsies. None of these autopsies involved any infectious diseases.
In another part of New York State, and prior to Dr. Muckova beginning her residency at URMC, Jesus Cardenas was in the custody of the Department of Correctional Services (DOCS). Upon his entry into DOCS custody in 1993, Cardenas had a PPD test administered on him by health services to determine if he had TB. The result came back positive. Further testing revealed that Cardenas was negative for acid fast bacilli and mycobacterium (MTB) (exhibit 1 at 155). Subsequent tests also showed that Cardenas was positive for TB.
In May 1995, doctors at Groveland Correctional Facility (Groveland) suspected that Cardenas’ TB had become active and thus, on May 13, 1995, Cardenas was placed in isolation (exhibit 1 at 31). The lab results came back showing that his TB was not active and so he was released from isolation. Cardenas was later hospitalized at Erie County Medical Center (ECMC) for health problems other than TB. On the day following his admission to ECMC, sputum specimens were collected from him and sent to the lab for analysis to determine if his TB had become active (exhibit 1 at 100). Cardenas was returned to Groveland on July 16, 1995 to continue his incarceration (exhibit 1 at 6), where he was placed in the infirmary in isolation while lab tests were performed on his specimens. On July 17, 1995, the lab tests performed at ECMC confirmed that the test for mycobacterium was positive (exhibit 1 at 22). Groveland’s infirmary was notified of this finding on July 20, 1995. The following day, lab studies confirmed that Cardenas was positive for mycobacterium tuberculosis (MTB) and that he was infected with active, highly contagious TB. As required by law, ECMC contacted James Buckel, who was the infection control nurse at Groveland, as well as point person for both Livingston County and the State at that time (T 7, 113, 171, 174).[2] Buckel testified that he in turn notified Groveland’s nurse administrator, *430 inpatient nurse and the facility service director (T 197). Buckel, however, was an employee of the Department of Health (DOH), not DOCS, and could not make an entry on Cardenas’ health chart (T 194). Since Groveland did not have a fax machine, the report was to be mailed by ECMC and would not be received until the following Monday or Tuesday, July 24th or 25th. Consequently, Cardenas’ chart does not have a notation from July 21, 1995 concerning the information that Buckel received from ECMC and communicated to the State, County and Groveland’s infirmary.
Cardenas passed away at 2:15 a.m. on the morning of July 22, 1995. The infirmary doctor was notified; he reported to the infirmary and pronounced Cardenas dead. The County Coroner followed and declared Cardenas dead at 2:40 a.m. on July 22, 1995. Buckel stated that, in his review of the decedent’s chart, it did not reveal that the Coroner was informed that Cardenas had tested positive for active, highly contagious TB.
It is at this point that fate intervened in a way that intertwined the end of Cardenas’ life with the beginning of Dr. Muckova’s career, and altered and forever changed Dr. Muckova’s life then, now, and in the future.
Pursuant to standard procedure, an autopsy must be performed on an inmate who dies in prison. Thus, the coroner contacted the Monroe County Medical Examiner’s Office on July 22, 1995 at 4:10 a.m. advising of the need for an autopsy on Cardenas and further advising that, when he entered Groveland, he was diagnosed as HIV positive and additionally that he may have been suffering from TB. Cardenas’ remains were transported to the Monroe County Medical Examiner’s Office where they were received at 5:45 a.m. (exhibit 2 at 22). The records that accompanied the body, including the report of the Livingston County Coroner, indicated, among other things, that Cardenas possibly had TB (exhibit 3 at 5). The Medical Examiner then released the body to URMC where, by agreement, the autopsy was to be performed. Permission for the procedure had been given by the Livingston County Coroner as well as the Monroe County Medical Examiner’s Office (exhibit 2 at 16-17). Cardenas’ chart contains an entry from some time on July 22nd by Nurse Sanford at Groveland, which sets forth that Buckel, the infection control nurse at Groveland, was notified along with the Monroe County Medical Examiner’s Office that Cardenas possibly had MTB at the time of his death. This is consistent with the information set forth in the Medical *431 Examiner’s records as well as the coroner’s records (exhibit 1 at 7A; exhibit 2 at 23; exhibit 3 at 4).
The difficulty with these records is that they are incomplete and inaccurate, in that the records expressed merely the “possibility” that Cardenas had active MTB when, in fact, as early as the afternoon of July 21 it had been confirmed that Cardenas was diagnosed with, and suffering from, active contagious MTB.
After the body was delivered to URMC, Dr. Muckova recalled being contacted on her pager around noon. The call did not originate from a telephone number that she recognized. She returned that page and, after speaking with a person whose name she could not recall, she contacted her supervisor, Dr. Bernard Pánner, to inform him of the arrival of the body from Groveland and the Medical Examiner’s facility. She also told Dr. Fanner that the decedent was known to have HIV or AIDS and was being ruled out for TB at the time of his death. He referred Dr. Muckova to an upper level resident in pathology who was also on call at the time. She contacted this more experienced resident and asked for her assistance and supervision over the autopsy but that resident refused {see also exhibit 6 at 1). Dr. Muckova then contacted another upper level resident, Dr. Xiao Yang, to assist and supervise the autopsy. Dr. Yang agreed to do so.
Prior to commencing the autopsy, Drs. Muckova and Yang called Dr. Fanner and asked for recommendations relating to precautions they needed to follow in performing an autopsy on someone who is being ruled out for TB. Dr. Muckova testified that both she and Dr. Yang followed Dr. Fanner’s recommendations in performing the autopsy. Dr. Muckova stated that, when she arrived at the hospital prior to the autopsy, she had not been provided with any medical paperwork that would have informed her of Cardenas’ condition prior to his death. The information she had and that she relayed to Drs. Yang and Fanner was that which she received during the phone call that she returned in response to being paged earlier that day. Dr. Muckova stated that she inquired of the diener,[3] Gordon Ballard, whether he had received any paperwork with the body. Ballard responded that he had not received any paperwork with Cardenas’ body.
Dr. Muckova prepared to perform the autopsy in accordance with URMC’s guidelines in cases where an autopsy subject has *432 HIV or AIDS (exhibit 12), and she further wore a dust/mist respirator mask, which is mandatory in cases where the autopsy patient is suspected of having TB. The other gear she wore during the autopsy included: hospital-issued scrubs, a protective mask, a face shield, and Kevlar mesh gloves covered with other gloves. Dr. Muckova testified that she wore only one mask while performing the autopsy.
URMC has a special “infectious room” for “high-risk” autopsies, such as cases involving TB, HIV or AIDS, because there is a significant risk that the persons involved in the autopsy could contract disease. The “infectious room,” which was not available on July 22, 1995, is different than the regular autopsy room in that it features more air exchanges per hour— 22-27, as compared to 5-7 in the regular autopsy room — as well as washable walls. This room is completely set apart from the regular autopsy room. Additionally, on the day of Cardenas’ autopsy, there was a problem with the air flow in the autopsy room, which created a very high risk of the airborne MTB pathogens being inhaled by the staff inside the room.
Further precautions were taken by the URMC staff to prevent the possible spread of infection. Ballard, the diener, removed all of Cardenas’ internal organs in one fell swoop to minimize the possibility of releasing any pathogens that could become airborne. Cardenas’ body was covered in plastic to prevent bone particles from aerosolization. Moreover, the body was bleached. The lungs were covered with formaldehyde soap and towels and were later inflated with formaldehyde instead of cutting them open. All the other internal organs were cut in half. Dr. Muckova testified that she followed all of Dr. Fanner’s instructions in preparing for and performing the autopsy that day.
Upon viewing the dissected organs, specifically the spleen, kidneys and liver, Dr. Muckova noticed “hundreds of thousands” of small, yellow-white colored lesions. No one in the room knew what those lesions were, so the organs were placed in a 10% formaldehyde solution and left until the following Monday so that smaller samples could be taken from them and observed under a microscope. Dr. Muckova explained that the decision to wait was made as a precaution against possible infection by minimizing the instant handling of tissue samples.
The following Monday, Dr. Muckova participated in a gross conference with her attending pathologist, Dr. Fanner. A “gross conference” is where the large organs that are fixed in formalin and cut up in different areas are placed on a tray *433 and the attending physician and resident discuss what is seen on those organs, and whether what they are seeing is normal or abnormal. At this gross conference, Dr. Muckova learned that Cardenas’ organs contained millions of MTB organisms, which meant that Cardenas had active TB. This disseminated TB was both active and “extremely contagious.” After it was learned that Dr. Muckova was exposed to TB, URMC’s Infectious Disease Control Department was notified so that they could attempt to determine who else may have been exposed. Dr. Muckova had a PPD test administered upon her in the wake of this incident on or about November 10, 1995. This was her second PPD test in 1995; as noted above, the May 30, 1995 test given to her as part of the program was negative for TB. The November 10, 1995 PPD test, however, was positive for TB. Following standard URMC protocol, Dr. Muckova needed to be checked out to see if her TB was active.
Dr. Muckova was prescribed six months of treatment with pyrazinamide (PZA) and ofloxacin (oflox) as a prophylactic measure to prevent her TB from becoming active. These particular drugs were chosen based on the strain of TB that Cardenas had, and in accordance with the information available at the time in the susceptibility report of the microbiology lab (exhibit 5). Dr. Muckova experienced a number of side effects from the drugs, including nausea, vomiting and fatigue. These side effects, which she experienced every day during that six-month period, left Dr. Muckova unable to perform her usual tasks in a satisfying manner and, consequently, her rotational schedule for the rest of the year was modified. She was pushed into “nonessential” positions that were less strenuous; instead of rotations in pathology, anatomic pathology, surgical pathology or autopsy, Dr. Muckova spent her time in “irrelevant” lab rotations. She referred to these rotations as “irrelevant” because it did not matter if she showed up or not as other staff were always present to do the tasks at hand.
The side effects from taking PZA and oflox also affected Dr. Muckova’s personal life, in that the ever-present nausea, vomiting and fatigue made it difficult to maintain normalcy from day to day. She went through periods of anxiety and depression and treated with a psychiatrist at URMC during that six-month period. Psychologically, it was quite stressful for her to live with the fact that there was a 5% chance of converting to active TB within the first two years after contracting the disease, and a *434 10% chance over her lifetime of converting to active TB.[4] Dr. Muckova was also well aware of the fact that there was an increased risk of converting to active TB in the event that her immune system was ever compromised.
Dr. Muckova, who also testified as an expert on her own behalf, spoke at length about how having TB could potentially affect her future medical care. There is a high likelihood that her TB could reactivate with the use of any immunosuppressive medications, which encompass some drugs that are quite commonly prescribed for a number of conditions. These include but are not limited to: steroids, asthma medications, irritable bowel syndrome medications and chemotherapy. Should Dr. Muckova contract a case of influenza or develop breast cancer at any point in her lifetime, she could not undergo treatment for either condition without the significant risk of her TB activating.
Dr. Muckova also testified with respect to what treatment would be available to her if her TB ever became active. Cardenas had what she referred to as “multi-drug resistant” TB, which means that his strain of TB, which passed on to her, was resistant to first-line agents. These agents, which are the most effective in killing the organism if that particular organism is susceptible to those drugs, include: PZA, Isoniazid, Rifampin, Streptomycin and Ethambutol. PZA, of course, was one of the agents prescribed to Dr. Muckova as part of her prophylactic treatment following her contraction of the disease. Given that they shared the same strain of TB, Dr. Muckova would be expected to show the same resistance to the first-line agents, meaning that she could not treat with those drugs with any efficacy.
This particular strain of TB may, however, be susceptible to several “second line” agents, which are not as effective in killing the organism but may inhibit the growth of the organism. These second-line agents include capreomycin, cycloserine, kanamycin, amikacin and oflox. Unfortunately for Dr. Muckova, she is allergic to the fluoroquinolone class of drugs, which includes oflox and another drug, levaquin, so she would be unable to treat her TB with those drugs. In fact, Dr. Muckova could only treat with two of the available second-line agents due to her allergies and the susceptibility of her particular strain of TB. She still could attempt treatment with even less-reliable *435 third-line agents, but those are not well-proven and the potential of an active case of TB becoming inactive would be severely limited. The second-line agents that are still available to Dr. Muckova have anywhere from an 18% to 50% chance of successfully converting active TB to inactive. Dr. Michael Cynamon, the State’s expert witness, testified that there were promising drugs being tested that may be able to help Dr. Muckova in the future, but there was no way of knowing right now whether those drugs would be effective unless and until such time that those drugs could be tested against a specimen taken from an active carrier of the disease.
Living with the knowledge of her own susceptibility to the possible development of active TB, and the limitations on possible treatment for both active TB and other diseases, is quite stressful, although Dr. Muckova testified that she has learned to deal with that stress as best as she can in the past 15 years. If she ever did convert to a case of active TB, she would have to be isolated from the general population with a potentially untreatable, contagious, communicable disease that carries a high risk of death. Generally speaking, one with active TB has to be treated for 18 months after their sputum converts, meaning from the first time of active infection until the time of the first negative sputum, in order to assure that there is no relapse. In the case of Dr. Muckova’s strain of MTB and the drugs with which she could treat it, she could be looking at an additional 4 to 11 months before that happens, and she would need to be sequestered for that entire period of time. In spite of all that, Dr. Muckova appears to have carried on to success both personally and professionally.
The saddest aspect of this case, perhaps, is that the entire situation was entirely avoidable. As noted above, James Buckel, the DOCS infection control nurse assigned to Groveland at the time, was notified by ECMC that Cardenas tested positive for active MTB on July 20, 1995. He informed Groveland’s nurse administrator, the inpatient nurse on duty as well as the Facility Service Director. This information, however, did not make its way into Cardenas’ chart. Buckel, for one, was prohibited from entering that information into the chart due to facility procedure at Groveland. This “firewall” prevented the assigned infection control nurse from entering information onto the chart of a patient that he was charged, in part, with overseeing. No explanation was ever offered as to why none of the other attending nurses or administrators at Groveland placed this infor *436 mation in Cardenas’ chart at the time but, unfortunately for Dr. Muckova, the chart reflects that none of the parties involved did so until after the body was delivered to URMC. Thus, the paperwork that made its way to the Monroe County Medical Examiner’s Office, and later URMC, with Cardenas’ body on July 22, 1995 failed to reflect that Cardenas tested positive for active MTB. While the paperwork reflected that Cardenas was still being ruled out for active TB, it failed to contain the crucial update of a positive test for active MTB. This, in my opinion, was negligent on the part of defendant and, thus, I now find that defendant is liable to claimant for the damage she has sustained in this claim.
In finding that defendant is liable, there is no question in my mind that Dr. Muckova was owed a duty of care by the defendant. While there does not appear to be any case on point with the situation in the instant claim, it is clear to me that a duty can be read from Correction Law § 70 (2) (a), which specifically directs DOCS to maintain prison facilities with “due regard to . . . [t]he safety and security of the community.” The Court of Appeals has previously stated that “[preventing the spread of communicable diseases to those outside the prison comes within the statutory direction” (Matter of Doe v Coughlin, 71 NY2d 48, 59 [1987]). While Doe involved the determination to deny an inmate with AIDS conjugal visits with his wife, I fail to see how the duty to protect people outside of prison from the spread of communicable disease from inside the prison should not apply to the maintenance of prison health facilities as well. Here, DOCS was responsible for Cardenas’ body both at the time of his death and at the time the body was transported to URMC for autopsy (see Schwartz v State of New York, 162 Misc 2d 313 [Ct Cl 1994]). Defendant’s agents had a duty to claimant to provide her with all of the relevant information with respect to Cardenas’ condition at that time, which should have included the vital information that he was carrying a case of active, highly contagious MTB. This information, due in part to the “firewall” that prevented Nurse Buckel from entering it into Cardenas’ chart, as well as apparent neglect by the other attending staff at Groveland, never made it to Dr. Muckova at URMC. Consequently, as a direct result of that breach of duty, Dr. Muckova was exposed to and contracted her own case of TB. Defendant’s breach of duty here resulted in the spread of a permanent and potentially fatal communic *437 able disease that claimant now must live with for the rest of her life.
Although, fortunately, Dr. Muckova’s TB has remained inactive since she contracted the disease in 1995, and it is clear to me that Dr. Muckova has sustained damage as a result of her actual exposure to the disease. Primarily, she forever has the burden of living with a case of TB that could reactivate with potentially fatal consequences. The difficult task for this court, perhaps, is to assign some monetary value to these damages. To date, claimant’s TB has not gone active, although there is about a 10% chance over the rest of her lifetime that it will activate and she will always have to live with that. If Dr. Muckova’s TB were ever to activate, she would have to be isolated from the general population with a potentially untreatable, contagious, communicable disease that carries a high risk of death, possibly for a period of as long as 29 months due to her particular strain of TB and the drugs available to her. Moreover, her treatment options are limited because of the strain of MTB that she carries. As set forth above, the particular strain is resistant to the first-line agents, which are the most effective. Moving beyond that, she would be able to treat with only two of the available second-line agents, as she is allergic to the entire fluoroquinolone class of drugs within those second-line agents. Treatment with third-line agents may be possible, but those drugs are not well proven and far less reliable. The drugs available to Dr. Muckova if her TB went active have anywhere from an 18%-50% chance of success in converting active TB back into inactive.
Dr. Muckova also testified to some very real physical and psychological effects during the six-month period after she tested positive for TB, including dealing with side effects from the prophylactic drug treatment that was prescribed to her, including nausea, vomiting and fatigue, which left Dr. Muckova unable to perform her usual tasks in a satisfying manner and, consequently, affected her rotational schedule for the rest of the year by pressing her into “non-essential” and “irrelevant” positions that were less strenuous. She also treated with a psychiatrist at URMC for six months due to the stress she felt after contracting TB. It is also clear, however, that Dr. Muckova has been able to maintain a successful personal and professional life since 1995 despite her TB.
In a case with such unique facts as this one, there is little in the way of prior case law to guide me with respect to an *438 appropriate damages award. I reviewed a number of cases involving cancer phobia, HIV/AIDS phobia and other exposure-related torts, and those cases usually hewed to one of two scenarios: either a person was exposed to a disease without actually contracting the disease, or a person was exposed to and contracted an active form of that disease. Here, we have exposure to and contraction of a disease that has, to date, remained latent. It cannot be denied, however, that Dr. Muckova’s life has been forever changed since July 22, 1995 as she now lives with the possibility of converting to an active and potentially deadly strain of TB for which her treatment options are significantly limited.
Moreover, should her TB become active, successful treatments to render inactive and noncontagious are limited. In fact, the probability that it could become active from this day forward is within the range of around 10%. If it cannot be rendered inactive there is a strong likelihood of death. She lives with the knowledge that because of her condition certain medical treatments available for treatment on nontuberculin diseases would not be utilized since such treatments could assist in her TB becoming active. Her experience with the prophylactic treatment she endured when first diagnosed with mycobacterium tuberculosis caused her to suffer serious side effects.
Dr. Muckova’s professional and personal life has been dramatically altered because of this incident. As she testified, she left her chosen specialty of pathology and entered the specialty of internal medicine. I found her to be sincere and candid in expressing the effect that this disease has had on her. Her candor was not tinged with any inclination toward embellishment. I believe that the fears she expressed were and continue to be honest and heartfelt. By the very nature of her profession she is acutely aware of what she will endure should it become active. While research continues on drugs that can treat this potentially pernicious disease, they are not available presently and will not be available to the public in the immediate future. She is cognizant and lives with the knowledge that she may not benefit from this research.
I am acutely aware of the statistical and empirical data propounded by Dr. Cynamon but it affords little comfort to her. Still the panoply of level I or level II drugs presently available cannot be taken by her without serious life altering side effects.
*439 Based on her age at the time of trial and her life expectancy of 38.1 years, assuming she remains in a latent state, I find that she is entitled to $500,000 for all emotional past and future damages. This number encompasses $275,000 for emotional past damages, and $225,000 in emotional future damages.

. This is the common abbreviation for the purified protein derivative test for the detection of tuberculosis.

. References to the trial transcript will herein be T — .

. A “diener” is a person in the lab who will handle, clean and prepare the body for autopsy and, in some instances, remove the organs for the autopsy.

. This was and is the proverbial “elephant in the room” which she has and will continue to live with for the rest of her life.